**Charles B. DILWORTH et al., Plaintiffs in Error,**

v.

**Leo R. FORTIER et al., Defendants in Error.**

No. 37965.

Supreme Court of Oklahoma.

Jan. 12, 1960.

Rehearing Denied March 22, 1960.

Application for Leave to File Second Petition for Rehearing Denied Sept. 13, 1960.

Janicke & Herlocker, Winfield, Kan., Rodgers & Gurley, and James E. Burger, Blackwell, Lowell Doggett, Ponca City, Neal A. Sullivan, Newkirk, for plaintiffs in error.

I. D. Ross, and David Ross, of Ross & Ross, Newkirk, for defendants in error, Earl Trenary, Floyd Trenary, Margalee Hartman Gogos, Minnie Myra Woodruff, and Charles L. Hartman.

Robinson, Shipp, Robertson & Barnes, by T. Murray Robinson, Oklahoma City, and Jochems, Sargent & Blaes, by Robert G. Braden, Wichita, Kan., for defendants

in error, National Cooperative Refinery Ass'n, Fortier and Wright, John Roy Evans, W. R. Yeager and M. P. Yeager.

BLACKBIRD, Justice.

This appeal concerns a quiet title action involving a quarter section of land originally described as the Northeast Quarter of Section 5, Township 27 North, Range 1 West, in Kay County, Oklahoma.

One Charles E. Dilworth homesteaded this tract (usually referred to herein merely by the abbreviation "NE") and thereafter, on September 15, 1913, he and his wife executed and delivered to Hercules Oil and Gas Company an oil and gas lease covering it, for a period of twenty (20) years "and so much longer as oil or gas is found thereon in paying quantities." The lease (which together with its leasehold will hereinafter usually be referred to merely as the "Hercules Lease") reserved to said lessors one-eighth of the oil produced and saved from the leased premises, and provided, among other things, that if "gas only" was found "in quantities large enough to transport * * *", then lessee would deposit to lessor's credit, for the produce of each well so transported, $100 each year after the completion of each such well. The deposit so provided will hereinafter be referred to as "the gas payment."

After an assignee of the above described lease, called Jones & Buell Company, had become its owner, the Dilworths, by instrument dated October 7, 1915, conveyed to one D. S. Rose, subject to said lease, an undivided one-half interest "in and to all the oil and gas and the oil and gas rights in or under * * *" the West Half of the leased tract. This conveyance specifically contemplated the grantee, Rose, receiving one-half of the royalties to be paid under the existing lease, and that he and the Dilworths would be equal tenants in common in the mineral rights, after said Hercules Lease had expired or "become void." Such an interest will hereinafter be referred to as a "mineral interest"; and it, or so much of it as has survived

the hereinafter described tax sale proceedings, if any, is now held by parties we will refer to herein as Wolfe, Mullendore et al.

The following Spring, or in April, 1916, a well was drilled on the leased quarter section that produced 10 barrels of oil per day. Later the same year, the Dilworths executed and delivered to one J. A. Frates a warranty deed, dated October 30, 1916, describing the entire quarter section (without mention of their previous deed to Rose) and reserving to themselves, for a period not to exceed 99 years, a one-hundred-dollar gas payment in words identical with those of the above described Hercules Lease, and also the same kind of one-eighth oil royalty prescribed in said lease. In said deed, it was also stated, in substance, that it was "the intention" to reserve to the Dilworths, their heirs and assigns, not only the specified "royalties" under the existing lease, but "under any subsequent oil and gas lease that may be made by *any owner of such land*, and and this reservation is to be construed as and deemed a covenant running with the land." (Emphasis ours.) The interest, thus described, will hereinafter be referred to as a "non-participating oil payment" to distinguish it from a "mineral interest", whose owner retains the exclusive right to lease it. (In connection with our use of the terms: "non-participating" and "working interest", notice the discussion in Colonial Royalties Co. v. Keener, Okl., 266 P.2d 467, 472.)

On November 11, 1916, Frates and his wife executed and delivered to Dilworth Townsite Company a warranty deed purporting to convey to said company, as "party of the second part" (without mention of Dilworth's above described deed to Rose) the entire Northeast Quarter of Section 5. This deed also contained, however, a reservation of one-eighth oil royalty, and provision for a one-hundred-dollar per year gas payment, substantially in the same words that had been employed in the deed the Dilworths had previously executed and delivered to Mr. Frates, as aforesaid.

After completion of drilling in the well heretofore mentioned, other wells producing gas were drilled on the NE under various assignments of the original Hercules Lease; and it is established that their production, and the payment of gross production taxes on same, commenced at least as early as the year 1918, and continued until September, 1951. Nevertheless, after 60 acres of said quarter section had, in 1917, been selected as a site for the Town of Dilworth, and platted into town lots by Dilworth Townsite Company, ad valorem taxes were assessed against them for the year 1917, and subsequent years.

In February, 1918, an assignee called Bermont Oil Company, which was then the owner of the Hercules Lease, assigned it to Empire Gas and Fuel Company, excepting from said assignment that portion of the NE "platted and known as the Town of Dilworth * * *". Thereafter, in 1928, by mesne assignments of the same lease, Cities Service Oil Company became the owner of the ⅞ths working interest in the oil rights; and Cities Service Gas Company became the owners of the ⅞ths working interest in the gas rights under said lease.

Thereafter, most of the tracts, and/or lots, comprising the NE were sold for delinquent ad valorem taxes assessed for years during which some (if not all) of the aforementioned wells on said quarter section were producing. After said taxes became delinquent and the tracts were purportedly sold therefor, one C. L. Hartman acquired a resale tax deed to them in 1945.

In 1948, Hartman conveyed his entire interest in NE, including a 15-acre strip extending along the southern edge of the Dilworth Townsite, to Minnie Myra Woodruff and Margalee Hartman Gogos. Following the cessation of production under the Hercules Lease, in 1951, Cities Service Oil Company and Cities Service Gas Company executed on and before September 3, 1952, and thereafter filed of record, a release of said lease. Later, during the same month, Minnie Myra Woodruff and Margalee Hartman Gogos conveyed their interests to Earl H. and Floyd Trenary, said grantors reserving to themselves an undivided one-half interest in the oil and gas rights in and under the property so conveyed.

In October, 1954, the Trenarys and their wives and Minnie Myra Woodruff and Margalee Hartman Gogos, hereafter sometimes referred to merely as "Woodruff and Gogos", executed and delivered to one W. R. Yeager an oil and gas lease purporting to cover the NE. It was provided in said lease that even if the lessors owned a lesser interest, than the entire fee simple estate, they should not receive less than one-eighth of the oil and gas produced and saved from the leased premises, and gas and casinghead gas used off said premises. This new lease (together with its leasehold) entered into since cessation of production under, and abandonment of, the Hercules Lease, will hereinafter be referred to as the "Yeager Lease."

By assignment, the ⅞ths working interest in this Yeager Lease, subject to a ⅟₁₆th overriding royalty in Southwestern Finance Company and Yeager, was acquired in equal parts, of an undivided one-half interest each, by National Cooperative Refining Association (hereinafter referred to as "National Co-op") and by Leo R. Fortier and Wayne W. Wright, referred to as Fortier and Wright. Fortier and Wright, designated by said owners of said lease as its operators, have, under its authority, and beginning in 1954, drilled six producing oil and/or gas wells on parts of the NE not included in the Dilworth Townsite, and, when the present action was commenced on June 2nd, 1955, by the successors in title of the original landowners, the Charles E. Dilworths (including the successors to the interest of their grantee J. A. Frates) as plaintiffs, and hereinafter referred to as the "Dilworth Group", the crude oil purchaser, Anderson-Pritchard Oil Company, had paid National Co-op the sum of $29,319.47, as the net proceeds of all production of said lease, between February 1, 1955, and June 1, 1955. During the pendency of this action,

another $111,030.27, accruing from the same source between the latter date and April 1, 1957, was held in suspense or, in effect, impounded, to be paid to the parties adjudged in this action to be entitled thereto.

. The position of the Dilworth Group at the trial, and here, indicated by the statements in their petition, may briefly, and in general substance, be summarized as follows: That by reason of the hereinbefore mentioned .production under the Hercules Lease during the years for which ad valorem.taxes were assessed, that became delinquent and gave rise to the tax sales and issuance of the resale tax deed to Hartman, in 1945, as aforesaid, the mineral estate in the NE was severed, for tax purposes, from said quarter section's whole estate, and that, instead of being subject to ad valorem taxes during those years, it was, in lieu thereof, subject to the gross production tax. Their conclusion from this premise was, and is, that the. sales for the ad valorem taxes, assessed for those years, could not legally have included said mineral estate, and .that therefore. said sales, the tax certificates evidencing them, and the resale, through which Hartman obtained his tax resale deed of 1945, were impotent to convey any title to said mineral estate. or to any so-called "oil and/or gas rights." The Dilworth Group's position is that, this being true, Minnie Myra Woodruff and Margalee Hartman Gogos could convey to the Trenarys no title.to any such interest or estate, and that therefore the Dilworth Group was entitled to have their title quieted to said mineral estate, and all oil and gas rights under the entire NE. In their petition, they did not specifically ask for cancellation of the Yeager Lease, but did pray that Fortier and Wright, National Co-op and Anderson-Pritchard Oil Corporation "be restrained and enjoined from going on or about .the premises, producing or attempting to produce oil or gas therefrom, or in any manner interferring with" their ownership of the minerals and royalties in the premises and that they have an accounting from, and judgment against, said defendants for all of the oil or other minerals produced .from the premises.

At this point we will make no reference to the position of Woodruff and Gogos, or of the Trenarys, or of others whose title is deraigned through the Hartman resale deed of 1945, and whose names appear on the same brief herein with that of W. R. Yeager, except to say that they maintained that the basis of their title—Hartman's purchase at the 1945 tax resale—carried with it, and included, all minerals and oil and gas rights in and under the NE.

The judgment entered at the close of the trial without a jury did not uphold the position of either of the aforenamed groups of adversaries in toto. As concerns.the issues in this appeal, there inheres in said judgment the following findings and conclusions, among others:

. (1). That the Dilworth-Rose deed of October; 1915, conveyed to Rose an undivided ½ mineral interest in the W NE, now owned by Wolfe, Mullendore et al.;

(2). That the Dilworth-Frates deed of October, and the Frates-Dilworth Townsite Company deed of November, both in 1916, left the Dilworth Group with a one-hundred-dollar per annum gas payment covering the entire NE, and a non-participating oil payment of an undivided ⅛th as to the E NE and an undivided ⅟₁₆th as to the W of said quarter section;

. (3). That by reason of development under the Hercules Lease, the .mineral estate in the NE (which included the above-described interests) was severed from the whole estate in .said.tract, and survived the hereinbefore mentioned tax sales and resale, never passing.to Hartman by the tax resale and the resale deed he acquired in 1945, but thereafter remaining.valid and intact until cessation of production under, and abandonment of, the Hercules Lease in 1951.

On the basis of such findings and conclusions, and others unnecessary at this point to mention, the judgment quieted title in the Trenarys to what was termed the "fee", or

"fee simple", in the NE, less certain lots in the Dilworth Townsite, and subject to, or diminished by, the following:

(1). The nonparticipating and contingent gas and oil royalty payment ($\frac{1}{8}$ as to E NE; $\frac{1}{16}$ as to W NE) interests of the Dilworth Group;

(2). The undivided $\frac{1}{2}$ mineral interest of Wolfe, Mullendore et al. in the W NE;

(3). A $\frac{1}{4}$th interest in the fee of the 15-acre strip South of the Dilworth Townsite, extending from East to West across the W NE, and in all oil and gas lease bonuses, rentals, and royalties, held in shares of an undivided $\frac{1}{4}$th each by Minnie Myra Woodruff and Margalee Hartman Gogos.

The judgment, inter alia, upheld the Yeager Lease generally, found that none of the production obtained under it had come from that part of the NE embraced within the Dilworth Townsite; and determined the lease to be a valid and subsisting one on the E NE, and, as to the W NE, it held the lease did not cover the undivided $\frac{1}{2}$ mineral interest owned by Wolfe, Mullendore et al.; and granted the latter recovery of $\frac{1}{2}$ of the proceeds of the sale of all oil and gas produced under said lease from the W NE, less said owners' proportionate share of the costs of "discovering and producing" it, "and the production tax thereon."

· After the overruling of a motion for a new trial filed by the Dilworth Group, another such motion filed by the Trenarys, Margalee Hartman Gogos, Minnie Myra Woodruff and Charles L. Hartman, hereinafter referred to collectively as the Trenary Group, and a third such motion filed by National Co-op, Fortier and Wright, John Ray Evans, W. R. and M. P. Yeager, hereinafter referred collectively as the "Yeager Group", the present appeal was perfected.

Under "Plaintiff's Proposition Number 3", the Dilworth Group asserts error in that portion of the trial court's judgment establishing their non-participating oil payment interest in the W NE, as being only an undivided $\frac{1}{16}$th, rather than an undivided $\frac{1}{8}$th part, or share. In support of their

contention that their title should have been quieted to the entire $\frac{1}{8}$th interest, they cite the wording of the reservation in the Dilworth-Frates Deed, and point out that there "was no pleading of any ambiguity in the deed" or any "testimony offered that the deed did anything but reserve a one-eighth in the whole quarter section." In this argument, the word "testimony" must have been used advisedly, for, not being as broad as the word "evidence", it disregards documentary proof in the form of the Dilworth-Rose mineral deed, that the Dilworths had executed almost a year previously, conveying an entire undivided one-half interest in the minerals to D. S. Rose. As a result of this conveyance, the Dilworths retained, before executing the subsequent Dilworth-Frates deed, only an undivided one-half interest in the minerals under the W NE. Consequently, when, by the later deed, they purported to reserve unto themselves, a $\frac{1}{8}$th oil payment in the entire NE, this reservation could extend—as to the W of said quarter section—only to the $\frac{1}{2}$ mineral interest which they then owned. We think the trial court committed no error in construing the reservation of this $\frac{1}{8}$th of $\frac{1}{2}$ as retaining in the Dilworths an oil payment interest of only $\frac{1}{16}$th in the W NE. Undisputedly, the Trenary Group did not specifically plead these conveyances, because they claimed *all* of the minerals under the entire NE through a new and different title, i. e., Hartman's tax title from the county. But, as the Dilworth Group had to prevail, if at all, on the strength of their own title (Settles v. Atchison, T. & S. F. Ry. Co., Okl., 318 P.2d 867), the effect of said deeds was necessarily in issue. In this view of the matter, and, as the Dilworth Group introduced those deeds as evidence of links in their own chain of title, they have no cause for complaint in the court's exercising its necessary prerogative of construing the deeds to arrive at the quantum of their present interest.

Under Proposition I in the Yeager Group's brief, and Propositions I and II in the Trenary Group's brief, it is urged that the trial court erred in holding that the in-

terests of the Dilworth Group survived the hereinbefore mentioned tax sales and re-sale, rather than being extinguished, or wiped out, thereby. By a rather lengthy and involved argument, in which they "break down" landowners' ownership of land, leased for oil and gas mining pur-poses, into three distinct interests, the Tre-nary Group, by excerpts from the Gross Production Tax Statute (Tit. 68 O.S.1951 § 821 et seq.), seek to show that the gross pro-duction tax is not an "in lieu" tax on said "reverter" interest, but that it is covered by ad valorem tax assessments, and therefore is cut off, or extinguished, by a valid tax re-sale, out of which a virgin fee simple title emerges, clothing the owner thereof with a new title to both mineral and surface es-tates. On the basis of such premise, the Trenary and Yeager Groups argue that at least as early as all production ceased under the Hercules Lease and said lease's aban-donment, title to all of the minerals, and oil and gas rights of whatever nature, vested in Minnie Myra Woodruff and Margalee Hartman Gogos. In another part of their argument, these Groups, pointing to the evidence indicating that no gross production tax was paid on any product of the NE's mineral estate, except natural gas, contend that said payment did not prevent all oil rights, in existence previous to the tax re-sale, from being extinguished thereby. These arguments are untenable in more than one respect.

■ Firstly, the gross production tax is not just a tax on the landowner's or les-sor's interest, or of just the lessee's inter-est in the mineral estate. It is a tax on both—on the entire mineral estate, includ-ing "the oil in place, the mining rights and privileges granted under a lease thereof and the royalty rights reserved thereunder * * *." Meriwether v. Lovett, 166 Okl. 73, 26 P.2d 200. In both the Dilworth-Rose and the Dilworth-Frates deeds, title to the oil and to the gas was severed together, and by the same instruments. Both of these fugacious minerals, which are almost in-variably discovered and produced together, and from the same strata or common source

of supply, are parts of the same mineral estate; and production from said estate *of either* of them brings about a severance of said estate, from the whole estate, for tax purposes. As such is the nature of the mineral estate severed in the present case, we think it unnecessary and inappropriate to answer queries posed by part of the Trenary Group's argument as to whether payment of the gross production tax—made in this case on gas—prevented the lien of the ad valorem taxes, assessed against the tract, from covering said tract's possible non-fugacious mineral deposits such as coal, lead and zinc.

■ In their argument under "Sub-Topic No. Four: The Tax Deed" the Trenary Group inserts a quotation from Secrest v. Williams, 185 Okl. 449, 94 P.2d 252, 253, to the effect that the sale of oil for ad valorem taxes passes title to the land, including the mineral rights, "whether severed or not * * *"; but an examination of said opin-ion shows that the severance there spoken of was a severance of title, rather than a severance for tax purposes, which latter only occurs when production commences. In this connection, see Peteet v. Carmi-chael, 191 Okl. 593, 596, 131 P.2d 767, 769, and Boone v. Claxton, Okl., 269 P.2d 980, 982, where the distinction between the sev-erance in that case and the one in Secrest v. Williams, supra, is noted. McCoy v. Chil-ders, 124 Okl. 256, 256 P. 25 (cited by the Trenary Group) in holding that the provi-sion in the gross production tax statute re-ferring to the lien for said tax as being "strictissimi juris", is in nowise contrary to the above-noted pronouncement in Meri-wether v. Lovett, supra. As above demon-strated, the expression "royalty interest" as used in said tax statute means not only pro-duction, but the "interest", or (mineral) es-tate, from which it is derived. Therefore, the definition of "royalty" the Trenary Group cites from Federal Land Bank of Wichita, Kansas v. Nicholson, 207 Okl. 512, 251 P.2d 490, is not applicable. Nor do the cases of Boone v. Claxton, supra, which much of the Trenary Group's argument concerns, and the cited case of Sears v.

Randolph, 195 Okl. 200, 156 P.2d 595, furnish them any relevant support. In holding in the Boone case [Okl., 269 P.2d 984] that the trial court should have quieted the title of the allottee, Mrs. Boone "to the fee of the lands outside of plaintiffs' fence * * *", we merely distinguished surface rights, which plaintiffs had bought at the resale (and to which they had perfected their title) from the remainder of the whole estate, which, because of production, had not been subject to the lien of the ad valorem taxes assessed against it.

The underlying fallacy and weakness that extends through most of the arguments of the Yeager and Trenary Groups (and especially the latter) is that they attempt to make of the lessee's abandonment of, and cessation of production under, the Hercules Lease, a vehicle for the vesting of title in them of all oil and gas deposits then left in place. The first step in this attempt is the contention that the Hercules Lease should be considered a conveyance of all oil and gas in place under the NE. However, they concede that, after execution of said lease, the lessors, the Dilworths, still had the right to have said minerals revert to them upon said lease's being abandoned or becoming inoperative. Therefore, if this "possibility of reverter" remained the property of Dilworth, and his successors in title, until lawfully extinguished—but the tax resale of 1945· (being a sale for delinquent ad valorem taxes, whose lien could not cover, or attach, to the mineral estate, because it was severed from the land's whole estate and subject to a different kind of tax (gross production) during the years for which the delinquent ad valorem taxes were assessed) could not accomplish such extinguishment —then what was there about abandonment of production under the lease that constituted it a muniment, or conduit, of title, and made it capable of changing the course of that reverter, so that, instead of reverting to the holders of the title from whence it came; it followed a completely different course and vested in the new, or "virgin" tax title? If the tax sales and resale did not fill this gap between the new and the old title, how could cessation of production, and abandonment of the lease, do it? We think the obvious answers to these questions demonstrate the utter unsoundness of the Trenary and Yeager Groups' position.

And, if the tax sales and resale did not cover the oil and gas mineral estate of the NE, they did not affect the right to lease said tract for mining those minerals—which right was incident to ownership of the minerals (see authorities cited in Morgan v. McGee, 117 Okl. 212, 245 P. 888, 891) and had already been exercised and was subsisting as a part of the mineral estate during the Hercules Lease's operation and development. As hereinbefore shown, such mining on this quarter section had for many years previous to the resale in 1945, and for several years thereafter, been done under the exercise of such right to lease by the homesteader, Charles E. Dilworth, and his wife. Thus the right might be said to have been pre-empted at the time of the tax sales and resale. Being withheld from these sales, no part of it passed to the county by reason thereof. Consequently, this right could not have been vested *by the resale* in any individual or group. It could not transcend the gap between the chain of title emanating from Charles E. Dilworth, and the new chain of title emanating from the county, any more than the rest of the mineral estate.

The Trenary and Yeager Groups' argument that the reservation as worded and described in the Dilworth-Frates and the Frates-Dilworth Townsite Company deeds had the effect of vesting the right to lease in whoever was the "owner of such land" at the expiration of the Hercules Lease, is untenable. That reservation applied only to the Dilworth chain of title; it did not apply to, or run with, an absolutely new and foreign title, such as that from the county. In view of the foregoing, we have concluded that the trial court erred in upholding the Yeager Lease on the strength of any purported rights its lessors deraigned through the Hartman resale deed of 1945. Neither of the parties who executed it derived any right, or lawful

power, to do so through the medium of that deed. That right and power remained in those who owned the land previous to its acquisition by the county for delinquent taxes. As those owners were the only ones who had the lawful right to execute a valid oil and gas lease on said quarter section, the trial court's judgment, at least in so far as based upon a contrary determination, was error.

As the rights of various parties affected by this fundamental error must be redetermined at a new trial, at which some of the alleged errors and/or issues, not dealt with herein, may never arise, or be materially different, we now express no opinion on them.

The judgment appealed from herein is hereby vacated, and the cause is remanded to the trial court for a new trial, not inconsistent with the views expressed herein.

DAVISON, C. J., WILLIAMS, V. C. J., and HALLEY, JOHNSON, IRWIN and BERRY, JJ., concur.

WELCH and JACKSON, JJ., dissent.

JACKSON, Justice (dissenting).

In view of the complicated fact situation involved in this case I think it may be helpful if I make my own statements of the facts, as I understand them, together with my own statement of the issues and contentions presented herein.

This action was brought in the trial court by Charles B. Dilworth, et al., for the purpose of quieting their alleged title to the mineral and royalty interests in the NE¼ of Sec. 5, Twp. 28 N, Range 1 East, in Kay County, Oklahoma. Plaintiffs deraign their titles from Charles E. Dilworth, the original patentee of the land in question. All parties proceeding with Charles B. Dilworth, et al., and adverse to the principal defendants will be referred to as plaintiffs.

The record shows that an oil and gas lease was executed on the land in 1913, and gas was discovered and produced thereunder from 1918 until 1951. This lease was released in 1952. Gross production taxes were paid each year while gas production was being obtained from this land between 1918 and 1951.

The defendants, Earl and Floyd Trenary, Woodruff, and Gogos, claim the fee title to said land subject to an oil and gas lease in favor of defendant Fortier, et al. They deraign their title from various resale tax deeds.

The record shows that during the time gross production taxes were being paid on the gas production from these premises, between 1918 and 1951, the ad valorem taxes on most of the property became delinquent and resale tax deeds were issued to Hartman and others. Defendants' claim of title is based on these resale deeds. It is admitted that the resale tax deeds were valid. Plaintiffs contend, however, that the tax deeds did not convey title to either the oil or gas in place for the reason that there was production and payment of gross production taxes on the gas for each year involved in the ad valorem tax sales which, plaintiffs assert, prevented the ad valorem taxes from being a lien on the minerals, and that therefore no minerals were conveyed by the tax deeds.

The defendants, Earl and Floyd Trenary, are now the owners of the tax titles, subject to a reservation of one-half of the mineral rights in favor of the defendants, Margalee Hartman Gogos and Minnie Myra Woodruff.

In October 1954, after the 1913 lease was abandoned and released, the above named defendants (owners of the tax titles) executed a new lease in favor of the defendant W. R. Yeager, which was assigned to the defendants, Fortier, Wright and National Cooperative Refinery Association, subject to overrides in favor of other defendants. Six producing oil wells have been obtained under this lease.

The trial court held that by reason of the production of gas and payment of gross production taxes thereon the oil and gas were severed for tax purposes so that the tax deeds did not pass title to same. The defendant tax deed purchasers, and their

lessees have appealed from this part of the judgment. Plaintiffs appealed from other portions of the judgment, but I will first consider defendants' appeal.

Defendants admit that a purchaser at a tax sale for delinquent taxes assessed during years of production and payment of gross production taxes takes *subject* to the rights of the lessee, and all others entitled to participate in the production, to extract the minerals on which gross production taxes have been paid for so long as production continues. They argue, however, that the possibility of reverter, in the event the lease is abandoned, does pass to the purchaser at the tax sale so that after the lease has been abandoned said tax deed purchaser owns all the minerals as an integral part of the land, and has the right to execute a new and valid lease, and the rights of former mineral interest owners are terminated. I cannot agree.

68 O.S.1951 § 821 provides that every person, etc. engaged in the production of certain designated minerals, including oil and gas, shall pay a tax on the gross value of the minerals produced and further provides that the payment of such tax shall be in lieu of all taxes "upon any property rights attached to or inherent in the right to said minerals, * * * upon the mineral rights and privileges for the minerals aforesaid belonging or appertaining to land * * *." In McNaughton v. Beattie, 181 Okl. 603, 75 P.2d 400, 402, this court held that this provision excluded the minerals which were subject to the exemption from the lien for ad valorem taxes, and therefore no title or right thereto could pass to the purchaser of property for taxes which became delinquent during years in which there was production and payment of gross production taxes on said minerals. In that case we said:

"The ultimate basis of a tax deed is a valid assessment and a lien. The lien can be no broader than the assessment, and the tax deed can be no broader than the lien. Consequently when the mineral rights are excluded from the assessment of the ad valorem tax because of the payment of the gross production tax, they are excluded from the lien and cannot be conveyed by the tax deed. * * *."

We have also said in numerous cases that during years of production and payment of the gross production tax, such tax is in lieu of all other taxes on the exempt minerals *in place*. Boone v. Claxton, Okl., 269 P.2d 980; Meriwether v. Lovett, 166 Okl. 73, 26 P.2d 200. In Knutter v. Smith, Okl., 307 P.2d 137, we held that the production and payment of the tax operated to sever the exempt minerals from the whole estate for the purpose of taxation. In view of the foregoing cases I am of the opinion that as to the exempt minerals no interest therein of any kind or nature passes to the tax deed purchaser, not even the so-called possibility of reverter.

Defendants argue that in all previous cases wherein the prior mineral owners prevailed against the tax deed purchaser, there was continuing production at the time of trial. They contend that we have never heretofore considered the rights of a tax deed purchaser after cessation or abandonment of production. In this defendants are in error. In Knutter v. Smith, supra, the production had ceased on part of the property involved in 1943, prior to trial. The opinion was handed down in 1957. We held that the tax deed purchaser who purchased for taxes which became delinquent during years in which gross production taxes were paid acquired no interest in the exempt minerals.

There is some merit in defendants' argument that certain language in Boone v. Claxton, supra, tends to support their contention, but the interpretation given such language by defendants is clearly in conflict with paragraph 4 of the syllabus in that case.

Defendants next contend that the production and payment of gross production taxes on gas alone did not preserve any rights in the oil or other minerals; therefore plaintiffs have no interest in the oil

rights or the oil from the six producing oil wells under the 1954 lease. I think this contention is correct.

With reference to tax deeds 68 O.S.1951 § 432f provides:

"* * * The issuance of such deed * * * shall vest in the grantee an absolute and perfect title *in fee simple* to said lands; * * *." (Emphasis supplied.)

The gross production tax act is obviously in conflict with the above mentioned statute to a considerable extent. We are not at liberty to take more from the fee simple title than is absolutely necessary to carry out the purpose and intent of the gross production tax act.

The first paragraph of 68 O.S.1951 § 821, provides that everyone engaged in the production of mining of "lead, zinc, jack, gold, silver or copper, or of petroleum or other crude oil or other mineral oil, natural gas and/or casinghead gas" shall file a return with the Tax Commission showing the location, kind, amount and value of such production and at the same time pay a prescribed tax thereon.

The sixth paragraph provides as follows:

"The payment of the taxes herein imposed shall be in full, and in lieu of all taxes * * * upon any property rights attached to or inherent in the right to said minerals, upon producing leases for the mining of asphalt and ores bearing lead, zinc, jack, gold, silver or copper, or for petroleum or other crude oil or other mineral oil, or for natural gas and/or casinghead gas, upon the mineral rights and privileges for the minerals aforesaid belonging or appertaining to land, * * * and any interest in the land, other than that herein enumerated, * * * shall be assessed and taxed as other property * * *."

In my opinion the above quoted language is equivocal as to the question of whether the production of one mineral and payment of gross production tax thereon, exempts the other designated minerals from ad valorem taxation. However, as hereinabove stated, we are not at liberty to extend the exemption or "in lieu" provision any further than necessary in order to carry out the intent and purpose of the Legislature. What possible reason could there be for preserving the rights to one mineral merely because the owner of another mineral is paying an "in lieu" tax on such other mineral? It is obvious that a tax paid upon the value of gas produced is not a payment of taxes on the lead, zinc, etc. which might never be produced or mined. A contrary view could completely free the minerals not being produced from any form of taxation, direct or indirect.

In McNaughton v. Beattie, supra [75 P.2d 403], the court did not hold that the tax deed conveyed no minerals, but only that it conveyed no oil and gas rights. The court acknowledged plaintiffs' contention that they had paid the gross production taxes on oil *and* gas, and then stated that "the gross production taxes were in fact paid." In the final paragraph of the opinion the court said:

"We hold that the deeds involved in the instant case operate as a conveyance of the surface rights, but do not convey the oil and gas rights. * * *."

In Meriwether v. Lovett, supra [166 Okl. 73, 26 P.2d 201], it was stipulated that oil *and* gas were produced and gross production taxes paid thereon during the years involved. The trial court entered judgment to the effect that any tax deed issued by the county would be "subject to the rights of plaintiffs in and to the *oil and gas* mineral rights." In Knutter v. Smith, supra [307 P.2d 139], we said:

"It is well settled that under such circumstances the mineral estate in the oil and gas does not pass with a resale tax deed issued for nonpayment of ad valorem taxes."

In Boone v. Claxton, supra, it is held in the syllabus that the tax is in lieu of all

other taxes upon the *oil* in place without mention of the gas in place.

In some of the above mentioned cases this court also said in either the body of the opinion or the syllabus that the tax deed did not convey the minerals or mineral rights in said land. However, it is apparent from the facts that the reference to minerals could have only referred to oil and/or gas. Therefore, the only serious question that is presented in this case is whether oil and gas are so nearly identical and so closely related that they must be treated as synonymous, so that production of one will preserve the other.

To begin with it does not appear that the Legislature has treated them as one in the "in lieu" provision of the statute.

In providing that the tax should be in lieu of other taxes upon leases the words of the statute are as follows:

"* * * upon producing leases for the mining of asphalt and ores bearing lead, zinc, jack, gold, silver or copper, or for petroleum or other crude oil or other mineral oil, or for natural gas and/or casinghead gas, * * *."

Thus, while natural gas and casinghead gas are grouped together, they both are apparently treated separately from oil.

Of course, if it appeared from a legal standpoint that the words "oil" and "gas" should be considered as synonymous then we might assume that the Legislature so intended. However, there is no legal basis for such a conclusion. In this connection plaintiffs place much reliance upon the fact that oil and gas are both hydrocarbons and are often closely related in many reservoirs. This is admittedly true, but forms no basis for concluding that the terms "oil" and "gas" are synonymous.

In Vol. I of Thornton on Oil and Gas, Sec. 63, it is stated:

"Oil and gas are not synonymous; and a lease for oil purposes does not embrace the right to take gas. If the lease requires the production of oil, the production of gas will not satisfy the covenant requiring a development,

within a certain time, of the territory for oil."

In Glassmire's work on Oil and Gas Leases and Royalties (Second Edition) Sec. 2, page 7, it is stated:

"Such solid minerals as coal, lead and zinc are to be clearly differentiated from fugacious minerals like oil and gas; and even the latter, while related minerals, are not regarded in synonymous terms."

Plaintiffs argue that it is impractical to separate the oil and gas rights in the same field. Yet the evidence in this case shows that the oil rights and the gas rights under the original lease were severed by assignments and separately owned for many years.

Nor is it material that oil and gas are usually included in the same lease. In fact the original lease in the instant case covered all the minerals. Could it be said this would mean that production and payment of gross production taxes on gas would preserve the zinc? What would be the rule if the owner of the minerals executed no lease but produced one mineral himself? The decision as to what minerals are to be covered by the lease is made by the parties, but can have no bearing upon the question of which of the minerals in place are to be free of the ad valorem tax lien.

Since the Legislature did not see fit to provide that the production of and payment of the tax on one mineral would be in lieu of ad valorem taxes on the other minerals, and did not indicate that oil and gas were to be treated any differently than other minerals in this regard, I cannot believe that the production and payment of the tax on gas alone is in lieu of the ad valorem taxes on the oil in place.

Our prior decisions are not of any substantial assistance on this question since it does not appear that this particular issue has ever been expressly considered by this court before in a case where the issue was material. In the Meriwether case there was production of, and payment of gross production taxes on both oil and gas. We

held that this preserved the oil and gas estate. However, the second paragraph of the syllabus suggests that the production and payment of the tax on either oil or gas is in lieu of any other tax on the oil and gas produced, the oil in place (with no mention of the gas in place), and that the tax deed conveys no mineral rights. In McNaughton v. Beattie, supra, it appears that gross production taxes were paid on both oil and gas. In the body of the opinion we held that the tax deed purchaser took subject to the *oil and gas rights*. But in the fourth paragraph of the syllabus we held that the tax deed did not convey the *mineral* rights in said land.

In Peteet v. Carmichael, 191 Okl. 593, 131 P.2d 767, we held in the syllabus that production of oil and a levy of gross production taxes thereon severed *all* the minerals, and that tax deeds such as those in the instant case did not convey any of the mineral rights.

On the other hand, in Edwards v. Gann, 208 Okl. 267, 255 P.2d 499, we held in the syllabus that where oil *and* gas was not being produced and gross production taxes paid during the years of delinquency in failing to pay the ad valorem taxes the resale tax deed conveyed all the minerals.

In Boone v. Claxton, supra, there is no mention of gas production. The fourth paragraph of the syllabus is identical with the 2nd paragraph of the syllabus in the Meriwether case hereinabove mentioned to the effect that production and payment of the tax on oil or gas is in lieu of other taxes on the oil and gas *produced,* the oil in place (with no mention of the gas in place), and that the tax deed conveys no minerals.

In Knutter v. Smith, supra, there is no mention of gas production. The first paragraph of the syllabus is identical to the syllabus in Peteet v. Carmichael, supra, to the effect that the production of oil severs the *entire* mineral estate. However, the body of the opinion limits the severance to the mineral estate in the oil and gas.

In most of the above cases there is language to the effect that production or production and payment severs *all* the minerals. This is clearly incorrect. The statute doesn't purport to cover all minerals. I have pointed out the above cases for the sole purpose of showing that this court has never been confronted with the question as to whether the production of and payment of the tax on one mineral will preserve others, and therefore has made no studied effort to resolve this question. I am of the opinion that the production of a certain mineral and payment of the gross production tax thereon, only frees that particular mineral in place from the ad valorem tax lien for the year of production and payment. I am of the further opinion that the production of gas and payment of the gross production tax thereon is not in lieu of the ad valorem tax on oil in place.

The remaining question is whether production alone, without payment of the tax, is sufficient to relieve that particular mineral from the ad valorem tax lien.

A small portion of the land here involved was sold for taxes which became delinquent in 1917. Plaintiffs introduced in evidence a well log showing the completion of an oil well in 1917, and showing an estimated initial production of 10 barrels with a notation thereon that the well had been plugged. The log was not signed until August of 1920, and was later filed with the Corporation Commission. There is nothing in the record to indicate that the discovery of, or production of any oil from this well was ever reported to the Tax Commission as required by the statute. The records of the Oklahoma Tax Commission show the payment of gross production taxes on gas only.

The gross production tax statute provides that the *payment* of the tax creates the exemption. But in Peteet v. Carmichael, supra, we held that it was not the payment but the production which accomplished this fact. In that case the court relied upon and quoted extensively from McNaughton v. Beattie, supra, [75 P.2d 403] as authority for such view. But in the latter case the court expressly stated that the gross production taxes must be

*paid,* before the "in lieu" provision took effect. The language of the court in this connection was as follows:

"It must be clearly understood that this separate taxable estate in the mineral rights exists only during the time when production is obtained from the property and gross production tax levied and *paid* thereon." (Emphasis ours.)

However, the result in Peteet v. Carmichael seems equitable. All the tax on the ⅞ths working interest had been paid, and a portion of the tax on the royalty interest was paid and a portion unpaid. The court said that the failure of the state officers to collect the taxes could not operate to make the minerals subject to ad valorem taxes.

In the instant case there was no dereliction of duty on the part of the state officials. They never had an opportunity to collect the taxes, because they had no reason to know that taxes were due, if in fact any were due. In this connection in In re Sinclair Prairie Oil Co., 175 Okl. 289, 53 P.2d 221, 223, we said:

"* * * Oil may be said to be produced for gross production taxation purposes within the meaning of the statute when it is brought to the surface and confined in such a manner as to permit its measurement as to quantity and its testing as to value."

Assuming the well log established that there was some showing of oil at or about the time the well was completed in December of 1917, there is a total lack of evidence tending to show that in such year there was any oil confined in such a manner as to permit its measurement as to quantity and testing as to value. The log only shows an estimated annual production of 10 barrels.

Plaintiffs produced witnesses who testified that at one time there were tanks on the lease and a walking beam operating.

But they did not testify as to the years in which these things were observed. Even if production alone is sufficient to create the so-called severance, plaintiffs would be required to prove production in the year the particular ad valorem taxes became delinquent. See Sears v. Randolph, 195 Okl. 200, 156 P.2d 595. In view of the fact that no production of oil in 1917 was reported or tax thereon paid to the tax commission as required by the gross production tax statute, coupled with the fact that the evidence fails to show that any appreciable amount of oil was produced in 1917, I am of the opinion that plaintiffs are not entitled to claim the exemption as to the lots sold for delinquent 1917 taxes.

I am of the further opinion that the tax sales involved herein vested title in the tax sale purchasers to all the mineral rights in said real property except the gas rights, so that now and at the time the lease was executed in favor of the defendant Yeager, one-half (½) of said minerals were owned by the defendants, Earl Trenary and Floyd Trenary, and one-fourth (¼) each by the defendants, Margalee Hartman Gogos and Minnie Myra Woodruff. The judgment of the trial court should have quieted their title to said minerals subject to the lease, and declared the lease to be valid to the extent that it covers such mineral interests.

All mineral rights, in the property acquired by tax deeds, except the gas rights, should have been quieted in the proper defendants free and clear of any claims on the part of the plaintiffs. The gas rights and gas royalty reserved should have been quieted in plaintiffs, except for certain lots and a 15 acre tract which I will not discuss.

While there are other problems presented, any discussion herein would serve no useful purpose and would unduly burden this dissent.

In view of my conclusions as herein expressed, I must respectfully dissent.