Charles B. DILWORTH et al.,
Plaintiffs in Error,

v.

Leo R. FORTIER and Wayne W. Wright, d/b/a Fortier and Wright, National Cooperative Refinery Association, a corporation, W. R. Yeager, M. P. Yeager and Roy John Evans, Defendants in Error.

Earl H. TRENARY, Floyd Trenary, Margalee Hartman Gogos and Minnie Myra Woodruff, Plaintiffs in Error,

v.

Charles B. DILWORTH et al.,
Defendants in Error.

NATIONAL COOPERATIVE REFINERY ASSOCIATION, a corporation, Wayne W. Wright, doing business as Fortier and Wright, John Roy Evans, W. R. Yeager and M. P. Yeager, Plaintiffs in Error,

v.

Charles B. DILWORTH et al.,
Defendants in Error.

No. 39843.

Supreme Court of Oklahoma.

May 12, 1964.

Rehearing Denied Sept. 30, 1964.

Application for Leave to File Second Petition for Rehearing Denied Aug. 3, 1965.

Robert G. Braden, Wichita, Kan., T. Murray Robinson, Oklahoma City, for Leo R. Fortier, and another.

Ross & Ross, Newkirk, for Earl H. Trenary, and another.

Janicke & Herlocker, Winfield, Kan., Rodgers & Gurley, Blackwell, Walter M. Doggett, Ponca City, by Neal A. Sullivan, Newkirk, for Charles B. Dilworth and another.

IRWIN, Justice:

National Cooperative Refining Association and Les R. Fortier and Wayne W. Wright, d/b/a Fortier and Wright, hereinafter referred to as Lessees, caused to be drilled six producing oil and/or gas wells on a quarter section of land in Kay County. The Lessees were operating under the terms of an oil and gas lease which had been executed by lessors who deraigned their title through tax sale proceedings.

An action was brought which had the effect of challenging the force and effect of the above described lease. The basis for that action was that the lessors had no interest in the minerals because the tax sale proceedings vested no interest in the minerals in the holders of the tax deeds and their assigns by reason of production of gas and the payment of the gross production tax thereon. The first appeal in this cause, Dilworth v. Fortier, Okl., 354 P.2d 1091, determined the force and effect of that oil and gas lease. We remanded the cause to the trial court for further proceedings and the present appeals challenge the trial court's judgment which was rendered after the cause was remanded.

In Dilworth v. Fortier, supra, we determined that the lessors did not obtain all of the mineral interest under the quarter section of land by virtue of the tax sale proceedings (because of production of gas and the payment of the gross production tax) and we held that the oil and gas lease executed by the lessors, who deraigned their title through the tax sale proceedings, was not a valid and subsisting lease on all the mineral interest purportedly covered by said lease.

The principal issues presented to the trial court after the cause was remanded and which are challenged in these appeals are: (1) Whether the lessors, who own only a portion of the minerals purportedly covered by the oil and gas lease, are entitled to receive from the Lessees an amount equal to one-eighth (⅛) of the value of all the production under the terms of the oil and gas lease, or entitled to only one-eighth of the production attributable to the minerals which lessors own and are actually covered by the lease. (The trial court determined the lessors were entitled to receive an amount equal to one-eighth of the value of *all* the production). (2) Whether the Lessees, who developed and produced the leasehold estate are entitled to recoup their costs of development and operation from the proceeds of production. (The trial court did not allow the Lessees the right to recoup their costs for drilling and developing the leasehold estate under two tracts where the lessors owned no minerals but did allow a proportionate share of the costs under one tract where the lessors owned one-half of the minerals). (3) Whether or not a receiver should have been appointed. (The trial court appointed a receiver).

The judgment appealed from will be set forth in detail in the separate propositions hereinafter considered.

To better understand the issues, a brief summary of the facts should be stated. The mineral interest involved is under a northeast quarter section of land in Kay County. The property was homesteaded by Charles E. Dilworth and in 1913 he and his wife executed an oil and gas lease covering the entire quarter section. The following spring a producing well was drilled on this property. Subsequent wells were drilled and the well records were filed with the Corporation Commission of the State of Oklahoma. The records of the Oklahoma Tax Commission disclose that a gross production tax on the gas

produced was paid every quarter or every month between the first quarter of 1918 to and including September, 1951. There is no evidence of oil production under the 1913 Dilworth lease. It was by virtue of this continued production of gas and the payment of the gross production tax thereon, under the 1913 lease and assignments thereof, that we determined in the case of Dilworth v. Fortier, supra, that all the minerals under the quarter section of land did not vest in the holders of the resale tax deeds and the oil and gas lease executed by the lessors, who deraigned their title through the tax sale proceedings, was not a valid and subsisting lease on the entire quarter section of land.

In 1928, the oil and gas lease executed by the Dilworths in 1913, in so far as the gas rights were concerned, was assigned to Cities Service Gas Company. This assignment of the gas rights covered the entire quarter section except the Dilworth Townsite located in the center of the quarter section. The trial court found that none of the production under the lease under consideration came from the Dilworth Townsite. Cities Service Gas Company produced gas and paid the gross production tax thereon until September, 1951. In 1952, Cities Service Gas Company filed its release of the lease assigned to it in 1928.

In 1945, C. L. Hartmen acquired resale tax deeds which had been issued for prior years, covering most of the lots or tracts in the quarter section of land. In 1948, he conveyed his entire interest to Minnie M. Woodruff and Margalee H. Gogos. Shortly thereafter, Minnie M. Woodruff and Margalee H. Gogos conveyed their interest to Earl H. and Floyd Trenary, but reserved an undivided one-half interest in the minerals. The interests of Minnie M. Woodruff, Margalee H. Gogos, Earl H. and Floyd Trenary will be referred to as the "Trenary Interest".

In October, 1954, the "Trenary Interest" executed and delivered the oil and gas lease under consideration which purported to cover the entire quarter section of land. The warranty clause was deleted. In addition, the lesser interest clause was stricken and the following provision was typed in the lease, "If said lessors own a less interest in the above described land than the entire and undivided fee simple estate therein, they nevertheless shall never receive less than the full ⅛th provided under paragraphs '1st, 2nd, and 3rd' above." This lease also contained a provision covering the "after acquired" interest of the lessors. This lease was in favor of W. R. Yeager and will be referred to as the "Yeager Lease".

By assignment, the "Yeager Lease", subject to certain reservations which are not material herein, was acquired by National Cooperative Refining Association and Leo R. Fortier and Wayne W. Wright, who are referred to as "Lessees".

In 1954, the Lessees began drilling operations and caused to be drilled six producing oil and gas wells on the quarter section of land, but no well was drilled on the Dilworth Townsite.

Before starting its drilling operations and development, the Lessees obtained a title opinion from an attorney. In that opinion, the attorney stated that the surface was owned by Earl H. Trenary and Floyd Trenary and the minerals and royalty were owned by Earl H. Trenary, Floyd Trenary, Minnie Myra Woodruff and Margalee Hartman Gogos. These four people were the lessors in the oil and gas under which Lessees drilled and developed the leasehold estate. In the attorney's opinion, this was stated:

"1. Obtain a commercial form of Lease from all four of the respective holders of the mineral interests as shown above with spouses if any joining in the execution of said lease.

"2. The abstract discloses old mineral reservations made in 1916 in favor of Charles E. Dilworth and wife, and in favor of J. A. Frates and wife, but we believe that these reservations

have long since been foreclosed by resale tax deeds beginning in 1921 for delinquent 1918 taxes and several succeeding tax sales down to September 17, 1945 at which sale D. L. Hartman establishes his chain of title. The Trenary title is derived from D. L. Hartmen. The same comment is applicable to the perpetual mineral interest conveyed by Dilworth to D. S. Rose and others in 1915. It is highly significant that Carl F. Truitt ratified the Empire Gas and Fuel Company Oil and Gas Lease in 1923 as shown at page 74. There would have been no need to ratify this lease if Truitt had not succeeded to the full mineral by his purchase at tax resale.

"In addition to the foregoing, I am told that you have made inquiry concerning any recent production on the subject premises and there has been no evidence of production of either oil and gas for the last several years. It would appear prudent therefor to obtain a lease from those parties as indicated in Paragraph I above and record the same prior to the initiation of drilling operations."

The record discloses that at the time the attorney's opinion was rendered, the attorney and the manager of exploration and development for National Cooperative knew that production had been had at one time on the quarter section of land, however, they were not aware of any recent production. The record further discloses that during the negotiations for the oil and gas lease that the attorney for the lessors and the attorney for the Lessees discussed generally that the lessor's interest was acquired through tax sale proceedings and the general legal effect of tax titles; and that an Oklahoma tax title was not generally considered a merchantable title, but that it could be a safe title. Lessor's attorney also testified that nothing was said about production upon the land and that the first time he learned there had been production was after the Lessees had gone

into possession, but that he had expressed his opinion "that the tax sale would carry severed minerals". The evidence indicates that Lessor's attorney expressed his oral views that the lessors had·a safe title.

At the pre-trial conference before the original trial the parties entered into the following stipulations:

"It is further stipulated by all parties to this proceeding that the tax sales so far as form and proceedings thereof were regular and valid, and the only contention concerning the tax sales of this property by the public is on the theory that at the time of production from the land and the payment of gross production tax the mineral interests thereunder was severed and did not pass by reason of the tax sales, and the tax sale is not challenged in any manner except by severance."

After the Dilworths executed the oil and gas lease in 1913, they made certain conveyances, but subject to reservations. The interest reserved by the Dilworths will be referred to as the "Dilworth Interest". The other owners of oil and gas rights, who deraign their title through the Dilworths, will be referred to as the "Rose Interest" and the "Frates Interest".

Other pertinent facts, the location of the wells drilled by the Lessees, the true ownership of the minerals, and the trial court's judgment will be set forth in different propositions for clarity.

## PROPOSITION I

The Lessees drilled and developed one well on the E½ NE¼. Under this tract the trial court determined that the "Frates Interest" (which was acquired from the Dilworths in 1916) owns the minerals but such interest is subject to, inter alia, an undivided one-eighth non-participating royalty interest in favor of the "Dilworth Interest."

The Lessees drilled and developed three wells on the north 65 acres of the W½ NE¼. Under this tract, the trial court determined that the "Rose Interest" (which

was acquired from the Dilworths in 1915) owns an undivided one-half interest in the minerals; and the "Frates Interest" owns the other one-half interest in the minerals but the "Frates Interest" is subject to an undivided one-sixteenth non-participating royalty interest in favor of the "Dilworth Interest".

The trial court's determination as to ownership of the minerals and the non-participating royalty interest is not an issue in this appeal.

The trial court determined that the "Frates Interest", the "Rose Interest" and the "Dilworth Interest" were entitled to all the production under the two tracts above set forth. In addition to determining that the above groups were entitled to eight-eighths, or all of the production, the trial court determined that under the terms of the lease executed by the lessors who deraigned their title through tax sale proceedings, such lessors were entitled to receive payment equal to one-eighth of the total production even though such lessors own none of the minerals under these tracts. This portion of the judgment will not be considered in this proposition but will be further discussed and considered in Proposition III.

The trial court found in its journal entry of judgment that the Lessees were not in good faith in the development and operation of the two tracts above mentioned and were not entitled to recoup their costs and expenses in connection with the development and operation from the proceeds of the production. In overruling the Lessees' motion for a new trial the trial court said, " * * * let the record show that the Court does not find a lack of good faith on the part of the defendants (Lessees) to involve moral turpitude, but bases its findings upon the fact that the defendants made an error of law on entering upon the premises. The Court further finds that they failed to make a reasonable investigation as to their legal rights prior to entry."

The Lessees contend that they were in good faith in developing and operating un-

der the oil and gas lease executed by the lessors who deraigned their purported title through tax sale proceedings and should be permitted to recover their costs and expenses from the proceeds of the production. It seems to be the theory of Lessees that they were entitled to rely upon the opinion of their title attorney and since the trial court validated the lease in the first trial and no contrary evidence was submitted on retrial, there is no evidence either by testimony or documents tending to show bad faith.

The owners of the minerals (the "Frates Interest" and the "Rose Interest") urge that the Lessees are not entitled to recoup their costs and this part of the judgment should be affirmed because the Lessees were guilty of culpable negligence in their failure to ascertain when production ceased under the 1913 lease executed by the Dilworths; that Lessees acted with willful disregard of their rights; and if Lessees honestly believed their title was good, it was not reasonable that they should so believe.

The "Dilworth Group", in effect, agree with the contention of the "Frates Interest" and the "Rose Interest" but further contend that since they were the owners of a non-participating royalty interest, they are entitled to their royalty payment free and clear of all costs irrespective of who produces it, and the question of good faith is not an issue in so far as their interest is concerned.

Lessees state in their brief that the effect of our previous decision (Dilworth v. Fortier) is to label them trespassers and that this is no longer an issue; but the issue presented is the quality of the trespass: Did they go on the lease in good faith or under such circumstances that the entrance could be said to constitute bad faith?

Without question, Lessees' entry upon the land did not constitute a trespass as they entered the land with the express approval of the lessors who owned the surface of the land. However, they were trespassers upon the oil and gas rights for the reason

they did not have a valid and subsisting oil and gas lease. We have heretofore considered cases where a lessee has drilled and developed oil and gas properties without a valid lease from the owners of the oil and gas rights.

In the early case of Barnes v. Winona Oil Co., 83 Okl. 253, 200 P. 985, 23 A.L.R. 189, the lessee obtained an oil and gas lease from a guardian and such lease was approved by the county court. Although we held the lease was null and void on the grounds the county court's order went beyond that court's jurisdiction under the procedure followed, the costs of drilling and developing were allowed the lessee. In that case we held:

"Where a person in good faith enters into peaceable possession of land upon which he owns an oil and gas lease and produces oil and gas therefrom, and thereafter said lease is declared void or invalid, the measure of damages to the landlord in an action for an accounting for the oil and gas produced from said premises by the lessee is the value of the oil at the surface or in pipe line or tanks wherever the same may be, less the reasonable cost of producing the same."

In the body of the opinion we said:

"To permit the owner of the land or another lessee to recover from the person who is in peaceful possession of the land and producing oil or gas therefrom, the value of the oil at the surface without deducting therefrom the cost of producing would be analogous to permitting the recovery of exemplary damages. The damages recoverable would be more than compensatory.

* * *

"The action to recover damages for the unlawful production and taking of oil and gas from the premises is in the nature of a tort, and the facts that permit the recovery of exemplary dam-

ages in an action sounding in tort has been stated by this court as follows:

'To entitle a plaintiff to recover exemplary damages in an action sounding in tort, the proof must show some elements of fraud, malice, or oppression. The act which constitutes the cause of action must be actuated by or accompanied with some evil intent, or must be the result of such gross negligence—such disregard of another's rights—as is deemed equivalent to such intent.' * * *

"To hold that the taking of the oil is willful, by a person who has obtained possession in an orderly manner without creating a breach of the peace, and is in peaceful possession of the land, operating under a lease which has not been declared invalid or void, and doing only what he is entitled to do under his contract, we think would be contrary to the intention and spirit of the law that the damages should be compensatory only."

In the Barnes case we said that the earlier case of Probst v. Bearman, 76 Okl. 71, 183 P. 886, dealt with a situation where a third party had purchased the lease pendente lite, or, in other words, was or might be considered an interloper, and the principle of law announced in that case was too broad when applied to a lessee in peaceful possession.

In the Texas Co. v. Pettit, 107 Okl. 243, 220 P. 956, 231 P. 463, an oil and gas lease was purchased pending a suit to cancel the lease and the purchaser went upon the land and commenced drilling operations over vigorous protests. In that case recovery of costs from drilling and developing was denied on the grounds that the purchaser had notice of the claims of the adverse parties and did not purchase the lease in good faith. In Zelma Oil Co. v. Nemo Oil Co., 84 Okl. 217, 203 P. 203, we allowed recovery of costs where the taking was inadvertent—or under a claim of right with a bona fide belief of title.

However, we also recognized the rule that "where the taking is reckless, willful, or intentional, or without claim of right or title, the trespasser * * *", is not entitled to recover his costs.

In Miller v. Tidal Oil Co., 161 Okl. 155, 17 P.2d 967, 87 A.L.R. 811, we cited with approval the rule of law announced in Barnes v. Winona Oil Co., supra, and in the body of the opinion said:

"In Sapulpa Petroleum Co. v. McCray, 136 Okl. 269, 277 P. 589, 590, it is said: 'The fact that a purchaser may err in judgment is not enough to impeach his good faith, but it exists when the purchase is made with an honest purpose, though the real title is not acquired.'

"Therein good faith is said to be the opposite of fraud and that its nonexistence must be established by proof. Good faith, as the term is used in the rule of law that a trespasser on the land of another who takes property therefrom shall be liable only for the actual damages if the property taken was taken in good faith, means that the taking is without culpable negligence or a willful disregard of the rights of others and in the honest and reasonable belief that it was rightful. The term has been employed in the authorities on this subject to characterize the acts of one who, while legally a wrongdoer, acted in the honest belief that his conduct was lawful. * * *"

In the Sapulpa Petroleum Co. case, supra, we said that color of title is sufficient; the expression "some deed or contract", is frequently used in statutes and decisions; the use of such words negatives the idea that true title is required and indicates color of title is sufficient to establish good faith. We also said that if true title were required, there would be no necessity for equitable or statutory relief on the grounds of good faith, for there would be no dispossession.

See also Bailey v. Texas Pacific Coal and Oil Company, 168 Okl. 275, 32 P.2d 709; Champlin Refining Co. v. Aladdin Petroleum Corporation, 205 Okl. 524, 238 P.2d 827; and 21 A.L.R.2d 380.

Although the above cases give us a guideline to follow, none of the cited cases concern facts where the lessee develops a leasehold estate where its lessor has deraigned its title through regular and valid tax sale proceedings and commences development and the lease is subsequently declared invalid for the reason the tax sale proceedings did not vest in the tax deed holders the mineral interests because of production and the payment of the gross production tax thereon.

In the instant action, the attorney who submitted his opinion to the Lessees knew that production had been had at one time from the quarter section of land. In Thomas v. Huddleston, 65 Okl. 177, 164 P. 106, we held that whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led and when a person has sufficient information to lead him to a fact, he shall be deemed conversant of it. Although the attorney may have assumed there had been no recent production, because of the fact that he knew there had been production, and that Cities Service Gas Company had not released its gas rights until 1952, we can not say that such was not sufficient to excite his attention as to the actual production. A check with the Oklahoma Tax Commission or with Cities Service Gas Company would have disclosed the production and a check with the Corporation Commission would have disclosed the plugging of the wells in 1951.

However, we can not say as a matter of law, that a lessee, who enters upon a leasehold estate under the circumstances presented herein, is not entitled to recoup his cost of drilling and developing a leasehold estate, because his attorney who advised him he had a valid lease, may be charged with knowledge that production of gas was had and the gross production taxes paid thereon during the years the tax sale proceedings were conducted. Whether or

not the Lessees are entitled to recoup their costs from the proceeds of the production depends upon the circumstances in each case.

In so far as concerns the Lessee having the right to rely on the opinion of its attorney, the trial court said at the original trial that, "I think they (the Lessees) were entitled to rely upon it". Yet, after the cause was remanded for further proceedings, without additional evidence, the trial court, in effect, determined that the Lessees were not entitled to rely upon their attorney's opinion.

As heretofore stated, it was stipulated that the tax sales proceedings were regular and valid and that such proceedings vested title to the surface in the holders of the resale tax deeds and their assigns.

It necessarily follows that there was nothing in the tax sale proceedings which would indicate or disclose that the holders of the tax deeds or their assigns did not become vested with all the interest purportedly conveyed by the resale tax deeds. Under Title 68 O.S.1961 § 451, this would be "an absolute fee simple title". Therefore, in order to divest the owners of the resale tax deeds of any interest purportedly conveyed by said deeds, it was necessary for the original owners of the minerals or their assigns to prove that the minerals did not vest in the holders of the tax deeds for the reason that production was had and gross production taxes paid. Until the original owners obtained a final judgment which resolved this issue in their favor, the owners of the resale tax deeds, or their assigns, were record owners of the absolute fee simple title to the property. Therefore, the owners of the resale tax deeds or their assigns had color of title when they executed the oil and gas lease, and when the Lessees started their drilling operations they were operating under color of title.

The Lessees obtained possession of the leasehold estate in an orderly manner without creating a breach of the peace and drilled and developed the leasehold estate either prior to the time *they* had actual

knowledge that the original mineral owners or the owners of the non-participating royalty interest claimed an interest or they could not be considered in bad faith for continuing the development. This statement is based on the following facts. The lease was executed by lessors who owned the surface of the quarter section of land. Although the "Dilworth Group" wrote to Lessees that they claimed an interest in a portion of the minerals, the evidence shows that most of the drilling and developing of the leasehold estate had been completed prior to the time Lessees had actual knowledge of the Dilworth Group's claim; or if the information came to Lessees prior to the time all of the development had been completed, the Lessees could not be considered in bad faith in continuing the development. See Barnes v. Winona Oil Co., supra, where we considered the distinction between further development of oil and gas properties and further development of ore or timber after notice of an adverse claim and we specifically refuted the language in Guffey v. Smith, 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856, which, in effect, stated that, "The continued taking after notice of another's rights is a willful taking and appropriation of the property of another", in the development of oil and gas properties.

Without question, Lessees' attorney should have ascertained when production was had on the property instead of rendering an opinion based upon an assumption that there had been no recent production. However, an examination of the majority and dissenting opinions in the Dilworth v. Fortier case, supra, discloses divergent views on whether or not the tax deeds included the mineral interest. It necessarily follows that even though Lessees' attorney may have had all the production facts, he could have still been of the opinion, based upon the facts and his interpretation of the law, that a lease executed by the lessors would be a valid and subsisting oil and gas lease.

This action is in the nature of a tort and to deny Lessees a recovery of their costs would be analogous to permitting the

recovery of exemplary damages by the "Frates Interest" and the "Rose Interest". To allow such recovery the proof must show some element of fraud, malice or oppression. The act which constitutes the cause of action must be actuated by or accompanied with some evil intent, or must be the result of gross negligence—such disregard of another's rights—as deemed equivalent of such intent. See Barnes v. Winona Oil Co., supra.

■ Although this action is in the nature of a tort action, it is an action of purely equitable cognizance (see Probst v. Bearman, supra) and must be determined on equitable principles. In examining the entire record we can not conclude that the facts in this case justify an award of exemplary damages. We therefore hold that the Lessees are entitled to recoup a reasonable cost for the drilling, developing and operating the wells located on the north 65 acres of the W½ NE¼ and on the E½ NE¼ against that portion of the production attributable to the "Rose Group" and the "Frates Group" as set forth in the conclusion of this opinion.

It is to be noted that we allowed recovery only against the "Rose Interests" and "Frates Interests" in the production and not against the "Dilworth Interest", which owned only a non-participating royalty interest. This is because the "Dilworth Interest" had the right to receive their share of production, free and clear of all costs, irrespective of who developed the property. They had no right to execute a lease, and had a lease been executed, the "Frates Interest" or their Lessees would have been responsible for the costs of development. In the instant action, the "Frates Interest" did not seek what they may have been entitled to as a royalty interest, but sought seven-eighths of the total production under the E½ NE¼ and seven-sixteenths of the production under the north 65 acres of the W½ NE¼ and cancellation of the lease. To hold the "Frates Interest" is not liable for the costs of developing the non-participating royalty interest that the "Frates Interest" was subject to, would be, in effect, awarding exemplary damages in favor of the "Frates Interest" against the Lessees, for one-eighth of the development cost on the E½ NE¼ and one-sixteenth of the development cost on the north 65 acres of the W½ NE¼. We therefore conclude that the "Dilworth Interest" share of the production can not be charged with the costs and expenses in drilling, developing and operating the leasehold estate.

## PROPOSITION II

The Lessees drilled and developed two wells on the south fifteen acres of the W½ NE¼. Under this tract the trial court determined that the "Rose Group" owns an undivided one-half interest in the minerals; and the "Trenary Group" own the other undivided one-half interest, subject, however, to an undivided one-sixteenth non-participating royalty interest in favor of the "Dilworth Interest". The trial court found that the "Trenary Group" and the "Rose Group" are co-tenants in the ownership of the minerals and that the Lessees had a valid lease from the "Trenary Group".

Judgment was rendered which granted Lessees the right to recover one-half of their costs of drilling and developing this tract from one-half of the production attributable to the "Rose Interest"; and "when, if ever, said sum had been received * * * from ½ of the production on said 15 acres, the said ½ of said production from that time forward shall be paid to said Rose interests, subject to current operating costs.

The "Rose Interest" contends the trial court erred in holding that as developing tenants in common, the Lessees were entitled to recover one-half of their costs from their one-half share of the production from this tract.

In this connection, the "Rose Interest" argues that one co-tenant may develop and recover his costs from the production if his co-tenant fails to develop so long as the

co-tenancy is fully recognized by the developing co-tenant; but when one co-tenant develops as the owner of all, the developing co-tenant cannot recover his cost. To sustain this contention, the "Rose Group" cites Prairie Oil and Gas Co. v. Allen, 8 Cir., 2 F.2d 566, 40 A.L.R. 1389; Howard v. Manning, 79 Okl. 165, 192 P. 358, 12 A.L.R. 819; Riddle v. Ellis, 139 Okl. 68, 281 P. 286; and Earp v. Mid-Continent Petroleum Corporation, 167 Okl. 86, 27 P.2d 855, 91 A.L.R. 188.

█ We can find no authority in the above cases which sustain the "Rose Group's" contention that the Lessees are not entitled to recoup a proportionate share of their costs of drilling and developing the fifteen acre tract against the production attributable to the "Rose Group". It is well established that the owners of undivided interests in the oil and gas rights in and under real estate are tenants in common, and each co-tenant has the right to enter upon the premises for the purpose of exploring for oil and gas without the consent of the other tenant in common; provided, however, that he can not exclude his co-tenants from exercising the same rights with reference to the common property. See Earp v. Mid-Continent Petroleum Corporation, supra.

The record is barren of any evidence that the "Rose Group" exercised or attempted to exercise their rights to enter upon the premises for the purpose of exploring for oil and gas or that they were excluded from going upon the premises. As we heretofore found in Proposition I, Lessees were in good faith in developing the other portions of the leasehold estate and entitled to recoup their costs even though the relationship of co-tenancy did not exist.

█ In _Minshall v. Berryhill,_ 83 Okl. 100, 205 P. 932, we held that where a lessee in good faith takes peaceful possession of the leased premises, believing that the lessor owned the entire title in the premises, and an action is brought by another person, who establishes an interest in the premises, the measure of damages arising in favor of the party establishing a partial interest in the premises is the value of his share of the oil at the surface less the reasonable cost of production.

We can only conclude that Lessees are entitled to recoup their proportionate share of the costs of drilling and developing the south fifteen acre tract of the W½ NE¼ against the "Rose Group's" proportionate share of the production and the trial court did not err in this regard.

## PROPOSITION III

The lesser interest clause was stricken in the oil and gas lease executed by the "Trenary Group" and the following provision was inserted.

"If said lessors own a less interest in the above described land than the entire and undivided fee simple estate therein, they nevertheless shall never receive less than the full ⅛th provided under paragraphs '1st, 2nd, and 3rd' above."

The trial court determined that under the terms of the lease the "Trenary Group" was entitled to a payment equal to one-eighth of the total production, after payment of taxes thereon, under the entire quarter section of land even though the "Trenary Group" owned minerals only under the south fifteen acre tract located in the W½ NE¼.

The Lessees contend that such judgment is in error because the "Trenary Group" is entitled to receive payment only from that portion of lease under which they owned a mineral interest and that the inserted clause does not modify the consideration for the lease in such manner as to convert the provision for royalty into something other than a royalty clause. Lessees urge "that as a matter of right, if not at law, and certainly in equity in which this case lies, that as to the production which the lessees owned no part of, the lessors should get nothing."

■■■ An oil and gas lease is a contract between the parties. In construing a contract the ordinary and usual meaning given to words and phrases should receive a like effect in the contract. If the provisions of a contract show clearly the intention of the parties, there is no cause for applying technical rules of construction, for where there is no doubt there is no room for construction. These rules should be observed in construing a contract, if the meaning is clear and unambiguous, even though the contract may contain harsh terms, or impose extra burdens on one or both parties to the contract. See Gypsy Oil Co. v. Ponder, 92 Okl. 181, 218 P. 663.

■■■ The language employed in the oil and gas lease is clear and unambiguous and there is no room for construction. Under its terms, the "Trenary Interest" was to receive not less than one-eighth of the production. To hold that they were entitled to such payment only from that portion of the lease under which they owned a mineral interest would give no meaning whatsoever to the fact the "lesser interest" clause was stricken and the one-eighth provision (above set forth) inserted in lieu thereof.

The Lessees made no attempt to rescind the oil and gas lease until the case of Dilworth v. Fortier, supra, became final. When that case became final, the contract as between the parties, was, in effect, rescinded by operation of law on the E½ NE¼ and the north 65 acres of the W½ NE¼. It necessarily follows that the "Trenary Group" was not entitled to payment equal to one-eighth of the total production, less taxes, from that portion of the production attributable to the E½ NE¼ and the north 65 acres of the W½ NE¼ after the Dilworth v. Fortier case, supra, became final. We hold the trial court erred in adjudging that the "Trenary Group" was entitled to such payment on these tracts after that case became final.

## PROPOSITION IV

After the case of Dilworth v. Fortier, supra, was remanded to the trial court, the Lessees filed an application for the appointment of a receiver to take possession of and operate the leasehold estate. A receiver was appointed by the trial court.

■■■ It seems to be the theory of those who opposed the appointment of the receiver that the Lessees should continue to operate the leasehold estate and bear the burden of such operation for the sole benefit of those entitled to the proceeds. No authority is cited to sustain this theory. We can not conclude that the trial court erred in appointing a receiver in the instant action.

## CONCLUSIONS

The "Trenary Group" is entitled to receive payment and recover a judgment against the Lessees, in an amount equal to the value of one-eighth of all the production, less the taxes thereon, produced from the entire quarter section of land to the date the case of Dilworth v. Fortier, supra, became final, and a legal rate of interest thereon from the dates such payments should have been made. That portion of the judgment in conflict with this is modified, and as modified, affirmed. After the Dilworth case became final, the "Trenary Group" is entitled to payment and to recover judgment against the Lessees in an amount equal to the value of one-eighth of the production from the south fifteen acres of the W½ NE¼, less taxes, and a legal rate of interest thereon from the dates such payments should have been made. That portion of the judgment in this regard is affirmed.

The judgment in regard to the "Dilworth Group" is affirmed.

The trial court's judgment concerning the south fifteen acres of the W½ NE¼ is affirmed.

That portion of the judgment of the trial court denying the Lessees their reasonable cost of drilling, developing and operating the E½ NE¼ and the north 65 acres of

the W½ NE¼ is reversed and remanded with directions. The trial court is directed to render judgment in favor of the Lessees granting the Lessees the right to recover from the "Rose Group's" proportionate share of the production, less taxes, one-half of Lessees' reasonable costs of drilling, developing and operating the wells on the north 65 acres of the W½ NE¼. However, the "Rose Group" is entitled to a legal rate of interest on its proportionate share of the net proceeds of production from the date it should have been paid after its share of the costs equals its share of production.

The trial court is further directed to render judgment in favor of the Lessees granting the Lessees right to recover from the "Frates Group's" proportionate share of the production, one-half of Lessees' reasonable cost for drilling, developing and operating the wells on the north 65 acres of the W½ NE¼ and all of the reasonable costs for the drilling, developing and operating the well on the E½ NE¼. The "Frates Group" is entitled to a legal rate of interest on its proportionate share of the net proceeds of production from the date it should have been paid after its share of costs equals its share of production.

This Court recognizes that it has considered issues which were not presented nor briefed by the parties. However, by affirming a portion of the trial court's judgment, and reversing and modifying other portions thereof, certain issues have arisen which this Court on appeal should determine in order to dispose of the controversy insofar as possible for this Court to do.

Judgment is affirmed in part, reversed in part, modified in part, and remanded with instructions to the trial court to conduct an accounting between the parties and render a judgment pursuant to this opinion.

HALLEY, V. C. J., and JOHNSON, WILLIAMS, JACKSON and BERRY, JJ., concur.

BLACKBIRD, C. J., and DAVISON, J., concur in part, dissent in part.