W.K. WARREN, Natalie O. Warren, John Joseph King, Jr., the William K. Warren Foundation, William K. Warren and the First National Bank and Trust Company of Tulsa, Trustees for Elizabeth Warren Blankenship Trusts D–1, D–2 and D–3, Dorothy Warren King Trusts D–2, D–3, D–4 and D–5, and Patricia Warren Swindle Trusts D–1, D–2, D–3 and D–4, W.K. Warren, Jr. and the First National Bank and Trust Company of Tulsa, Trustees for Warren Young Trust A, Marilyn Warren Cowart Trusts B–1 and B–2, and Marilyn Warren Vandever Trust C–3, Plaintiffs-Appellees,

v.

CENTURY BANKCORPORATION, INC., an Oklahoma corporation, Joseph P. Byrd, III, Jack M. Cochran, John O. Dean, Jack O. Dickson, Gerald J. Estep, John R. Forrester, H.D. Hale, Jewell Russell Mann, Mike Robinowitz and M. Milton Wolff, Directors of Admiral State Bank, an Oklahoma corporation, Action Financial Corporation, an Oklahoma corporation and Admiral Bank, an Oklahoma corporation, Defendants-Appellants.

No. 60414.

Supreme Court of Oklahoma.

Feb. 3, 1987.

As Corrected Feb. 4, 1987.

Rehearing Denied Sept. 15, 1987.

Kevin M. Abel, Abel & Associates, Tulsa, for defendant-appellant Admiral State Bank, now Century State Bank.

Floyd L. Walker, Pray, Walker, Jackman, Williamson & Marlar, Tulsa, for all other defendants-appellants.

OPALA, Justice.

The minority shareholders of Century Bank [Bank] brought this shareholders' derivative suit[1] against the Bank's directors [directors], Century Bankcorporation, Inc. [Century] and Action Financial Corporation [Action]. Century owns more than 80% of the Bank's stock. Action is a wholly-owned subsidiary of Century and is in the business of making loans. The minority stockholders alleged that Century's ownership and operation of Action violated then existing statutes which prohibited branch banking. The minority stockholders also claimed that Action was unfairly competing with the Bank and that the directors and Century have caused the Bank to pay excessive management fees to Century.

The management of the Bank, Century and Action, are all closely related; the Board of Directors of both the Bank and Century are comprised of the same individuals. One board member, John Dean, serves as the president and chief executive officer of Century and Action. Another board member, Jack Cochran, is vice-president of Century and later became the vice-president of Action as well. The Bank paid Century management fees for the consulting services of both men. A loan officer at the Bank, Larry Johnson, was transferred to Action upon its creation and named its chief operating officer and vice-president.

Action was the brain child of John Dean. After the Bank's officers conducted a survey to determine the best location for a loan office, Action was placed on the outer edge of the Bank's market area. It was hoped that Action could attract new, hope-

John Henry Rule, Gable & Gotwals, Pat Malloy, Malloy and Malloy, Tulsa, for plaintiffs-appellees.

1. The trial court treated this suit as one in equity. Neither party sought below a jury trial. Under Oklahoma law a stockholders' derivative suit is cognizable only in equity. It cannot be maintained at law and neither party is entitled to a trial by jury as a matter of right. *Steinway v. Griffith Consolidated Theatres,* Okl., 273 P.2d 872, 877–878 [1954]. For cases announcing a contrary rule, see Annot., Right to Jury Trial in Stockholder's Derivative Action, 32 A.L.R.4th 1111 [1982].

848

fully commercial, borrowers. Because it was anticipated that the Bank would purchase the majority of the loans made by Action, it was believed that Action's operations would increase the Bank's revenues.

Although the majority of Action's loans were made to borrowers who had not previously been Bank customers, the district court held that Action had unfairly competed with the Bank by making loans to previous Bank customers or customers who knew Larry Johnson from his days as a loan officer for the Bank. The district court enjoined Action's operations and ordered Action and Century to account to the Bank for all income derived from loans to borrowers with either characteristic. The trial court also found that the management fees for Dean and Cochran were unreasonable and improper and ordered Century to return the monies paid by the Bank to Century for their services. The accounting was then reduced to a decreed monetary award in the amount of $208,179.83 for the excessive management fees and $339,405.00 for the diverted loan business. The plaintiffs (minority stockholders) were awarded $108,506.98 for attorney's fees and costs in prosecuting the action—$103,846.09 from the Bank and $4,659.89 from Century and Action.

The five issues presented for our decision are: [1] Did the defendants—Century and Action—impermissibly divert loan business from the Bank to Action? [2] If so,

did the trial court correctly determine the amount of damages for the diverted loan business? [3] Did Century cause the Bank to pay excessive management fees? [4] Are counsel fees and costs recoverable in a stockholders' derivative action? and [5] Did Century's ownership of Action constitute branch banking in violation of state banking laws? We resolve the first four issues by answering them in the affirmative. The fifth issue need not be reached for decision because we find that other grounds amply justify our affirmance of the trial court's decree and its monetary award.[2]

# I

## CENTURY'S DIVERSION OF LOAN BUSINESS FROM THE BANK WAS NOT "INTRINSICALLY FAIR"

### A

### THE "INTRINSIC FAIRNESS" TEST

Ordinarily, a court will not second-guess a decision of the majority interest in a corporation. The "business judgment" rule, which is a reflection of this policy, is bottomed on the rationale that the majority in a corporation have the right to dictate corporate policy for better or for worse.[3] Under this rule, majority decisions are left undisturbed unless there is a *clear showing* that the majority interest has committed a breach of trust.[4]

Courts have recognized that the "business judgment" rule is sometimes insuffi-

---

2. Since the district court's decree under review here was rendered, the statutes prohibiting branch banking have been repealed. See Section 4 of the Okl.Sess.L. 1983, Ch. 221 which repealed (1) 6 O.S. 1981 §§ 2061–2064 and (2) Okl.Sess.L. 1971, Ch. 132, § 1 and Ch. 352, §§ 11 and 12. New legislation that authorizes branch banking is found in 6 O.S. Supp. 1983 § 501.

3. See *Gaines v. Gaines Bros. Co.*, 176 Okl. 583, 56 P.2d 863, 868 [1936] and *Trans World Airlines, Inc. v. Summa Corporation*, 374 A.2d 5, 9 [Del.Ch.1977].

4. In determining the limits of fairness in parent/subsidiary business dealings Delaware courts have made a distinction between the so-called "intrinsic fairness" standard (see footnote 6 *infra*) and the "business judgment" rule.
*Business Judgment Rule.* Delaware will ordinarily apply the business judgment test to actions of the parent corporation where the terms

of a parent/subsidiary transaction are not set by the parent but by a third party, such as a state or federal agency. Evaluation of the transaction under this standard provides that in the absence of a showing of bad faith or of a gross abuse of discretion, the courts will not interfere with the business judgment of the directors if their decisions can be attributed to any rational business purpose. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 [Del.Supr.1971]; *Gabelli & Co. v. Liggett Group*, 444 A.2d 261, 264–265 [Del.Ch. 1982]. See *Getty Oil Company v. Skelly Oil Company*, 267 A.2d 883 [Del.Supr.1970], where the transaction itself and its terms were fashioned by the federal government in the Mandatory Oil Import Program and not by Getty. The same approach was taken in *Meyerson v. El Paso Natural Gas Company*, 246 A.2d 789 [Del. Ch.1967], which involved the filing of consolidated tax returns by a parent and a controlled subsidiary qualified so to do under the Internal Revenue Code. Substantial tax savings

cient.[5] A parent corporation, or majority shareholder, is in a position to dictate a subsidiary's business dealings. Where the parent corporation exercises this control in a manner which allows it to receive a benefit from the subsidiary that is not shared with the subsidiary's minority shareholders, the "intrinsic fairness" test is used by courts to scrutinize the transaction.[6] Under this test, a parent corporation bears the burden to show that the entire transaction was fair in order to prevent chancery's intervention.[7]

Although this court has not yet expressly adopted the "intrinsic fairness"

test, its application is consistent with Oklahoma's extant jurisprudence. Our case law recognizes that corporate directors stand in a fiduciary relationship to their corporation and its stockholders.[8] It also notes that a majority stockholder has a fiduciary duty not to misuse his power for his benefit and at the expense of the minority shareholder.[9] Equity will closely scrutinize a transaction when it is shown that one occupying a confidential relationship gains an undue advantage over another.[10]

The relationship of the parties and the transactions under attack in the instant case activate the "intrinsic fairness" test.[11] There was ample testimony to support the

---

achieved through the consolidated returns were retained in their entirety by the parent. This was held to be a business judgment with which the court should not interfere absent a showing of "gross and palpable" overreaching.

5. *Trans World Airlines, Inc. v. Summa Corporation, supra* note 3 and *Walden v. Elrod,* 72 F.R.D. 5, 14 [W.D.Okl.1976].
   The business judgment rule is a presumption that a rational business decision of the officers or directors of a corporation is proper unless there exist facts which remove the decision from the protection of the rule—such as self-dealing and conflict of interest. *Schreiber v. Pennzoil Co.,* 419 A.2d 952, 956–957 [Del.Ch. 1980]. In Delaware it has long been established that, if a complaining stockholder shows that a parent corporation was diverting business from its subsidiary to another entity and also shows that the parent benefited from the transaction to the exclusion and detriment of a subsidiary, *the parent is not entitled to rely on the presumptions afforded by the business judgment rule but must bear its heavy burden of proving the intrinsic fairness of the transaction vis-a-vis the subsidiary. Schreiber v. Pennzoil Co., supra* at 956–957 and *Sinclair Oil Corporation v. Levien, supra* note 4.

6. The *intrinsic fairness* test has been applied by the Delaware courts where the parent corporation controls the making of the transaction and the shaping of its terms, with a resulting shift in the burden of proof. *Sterling v. Mayflower Hotel Corp.,* 93 A.2d 107 [Del.Supr.1952]; *David J. Greene & Co. v. Dunhill International, Inc.,* 249 A.2d 427 [Del.Ch.1968] and *Schreiber v. Pennzoil Co., supra* note 5. Under this test, those asserting the validity of the corporation's actions have the burden of establishing the entire fairness of the challenged transaction to the minority stockholders, sufficient to pass the test of careful scrutiny by the courts. *Singer v. Magnavox Co.,* 380 A.2d 969, 976 [Del.1977] and *Trans World Airlines, Inc. v. Summa Corporation, supra* note 3 at 9.

The fiduciary duty owed by a parent to its subsidiary is not alone sufficient to invoke the intrinsic fairness standard. That standard is applied only when the fiduciary duty is accompanied by self-dealing. *Sinclair Oil Corp. v. Levien, supra* note 4. A basic situation for its application is one in which the parent has received a benefit to the exclusion and at the expense of the subsidiary. In *Trans World Airlines, Inc. v. Summa Corporation, supra* note 3, the intrinsic fairness test was applied to parent/subsidiary dealings not approved by the Civil Aeronautics Board but not to those approved by the Board. Where the plaintiff can prove that the majority shareholder has used his control over the corporation's board of directors to engage in self-dealing, the Delaware courts have judged the self-dealing action of the dominated board by the test of intrinsic fairness. *Sinclair Oil Corp. v. Levien, supra* note 4 at 719–720, *Getty Oil Company v. Skelly Oil Company, supra* note 4 and *Warshaw v. Calhoun,* 221 A.2d 487, 492–493 [Del.Ch.1966].

7. *Trans World Airlines, Inc. v. Summa Corporation, supra* note 3 at 13.

8. *McKee v. Interstate Oil & Gas Co.,* 77 Okl. 260, 188 P. 109, 112 [1920].

9. *Renberg v. Zarrow,* Okl., 667 P.2d 465, 472 [1983].

10. *Looney v. Chastain,* Okl., 395 P.2d 571 [1964]. See also, *Walden v. Elrod, supra* note 5 at 15.

11. This case may also be analyzed within the framework provided by the "corporate opportunity" doctrine. The thrust of our inquiry is whether Century wrongfully usurped the Bank's opportunity to make loans either to previous Bank customers or to customers who knew loan officer Johnson from his days at the Bank. It is generally settled that the elements necessary to establish that a corporate opportunity has been

district court's finding that Century controlled the business decisions made by the Bank. In addition, from the relationship of the parties, one can infer that such control existed. Century owned greater than 80% of the Bank's stock and Century's Board of Directors also served as the Bank's Board of Directors.

█ Century argues that the creation and operation of Action was intrinsically fair. Century's evidence showed that during Action's operations the Bank's revenues increased. Century also introduced several other economic ratio studies to show that the Bank had benefited from Action's operations. *This argument misses the main point.* Assuming that one could attribute the Bank's increased profitability to Action's operations, *the fact remains that Action competed with the Bank.* Century, in effect, argues that Ac-

tion can compete with the Bank and deprive the Bank's minority shareholders of the lost profits so long as the Bank benefits in some way. We cannot accept this argument. *The Bank should not have to settle for a piece of the pie when it is entitled to all of it.*

By making loans to past customers of the Bank and by transferring a Bank loan officer to Action, Century enabled Action to make loans that the Bank could have made.[12] Any income Action derived from these loans would be lost to the Bank's minority shareholders as Action was a wholly-owned subsidiary of Century. We cannot say that the district court's finding—that Century failed to sustain its burden to show the entire transaction was intrinsically fair—is clearly contrary to the weight of the evidence heard below.[13]

---

usurped are [1] the opportunity was one in which the corporation had an expectancy, [2] the corporation was able, financially and otherwise, to take advantage of the opportunity itself, and [3] the party charged with taking the opportunity acted in an official, as opposed to an individual, capacity. *Schreiber v. Bryan,* 396 A.2d 512, 518–519 [Del.Ch.1978]; *David J. Greene & Co. v. Dunhill International, Inc.,* supra note 6 at 430–431; *Johnston v. Greene,* 121 A.2d 919, 923 [Del.1956] and *Guth v. Loft, Inc.,* 5 A.2d 503, 510 [Del.1939]. These principles are applicable in determining whether a majority stockholder, by virtue of his control of corporate functions, has preempted an opportunity which rightfully belongs to the corporation. *David J. Greene & Co. v. Dunhill International, Inc.,* supra at 435.

Whether a corporate opportunity has been wrongfully taken depends on the facts and the reasonable inferences to be drawn therefrom. The Bank clearly had an expectancy in making loans either to *previous Bank customers* or to *customers who knew loan officer Johnson from his days at the Bank.* Even if the Bank could not have operated Action because of the then-existing branch banking prohibition, the Bank could certainly have legally originated loans to these customers. The Bank was financially able to make loans to customers with either of these characteristics. In fact, the defendants' own evidence showed that 82.9% of loans originated by Action were sold to the Bank. The evidence makes it readily apparent that the Bank would have had the financial resources to originate the challenged loans itself. Finally, Century usurped the Bank's opportunity to make loans to previous Bank customers and to customers who knew loan officer Johnson from his days at

the Bank while it was a majority stockholder of the Bank.

Under these circumstances, *Century had the burden* of proving that the Bank "was not stripped of a corporate opportunity." *Schreiber v. Bryan,* supra at 519; see also *Schreiber v. Pennzoil Company,* 419 A.2d 952, 956–957 [Del.Ch. 1980]. Where, as here, the majority stockholder controls the origination and the terms of a transaction which benefits the majority stockholder to the exclusion of the minority stockholders, the majority shareholder has the burden to show that the entire transaction was "intrinsically fair." *Schreiber v. Pennzoil,* supra at 958 and *David J. Greene & Co. v. Dunhill International, Inc.,* supra at 431. Century has failed to sustain this burden.

**12.** We believe that the plaintiffs'—minority shareholders'—burden here was not to show that each and every loan Action made to previous Bank customers or to customers who even knew loan officer Johnson from his days at the Bank could have been originated by the Bank were it not for Actions' operations. Rather, we believe the plaintiffs were required to show merely that the Bank had a *reasonable expectancy* in making loans to those customers.

**13.** Because the trial court's monetary award was decreed here against Century and Action for excessive management fees and for the income from the tainted loans, *the directors' liability for these sums is not at issue before us and need not be reached either for resolution or discussion.* We note the general rule which appears to be that a director may be personally liable for exploiting a corporate opportunity only if that director personally profits from that opportuni-

## B

### THE AWARD OF DAMAGES IN AN AMOUNT EQUAL TO "ALL INCOME" FROM THE DIVERTED LOAN BUSINESS WAS NEITHER CLEARLY CONTRARY TO THE WEIGHT OF THE EVIDENCE NOR TO THE APPLICABLE PRINCIPLES OF EQUITY JURISPRUDENCE

The district court ordered Century and Action to furnish an accounting of loans made by it to former bank customers as well as to borrowers who knew Larry Johnson while he was a Bank employee. The amount adjudicated against Century was equal to "all income" from these loans. Century reported that while its total income from the loans was $339,405, it had incurred expenses in excess of that amount in order to generate these loans. The trial court declined to allow Century's expenses. It decreed a monetary award against Century and Action for the full amount of income from the diverted loans.

Century attacks this disposition on two grounds. First, it asserts that the money award represents the entire amount of both principal and interest received by Action, the principal having been derived from Action's separate capital. It argues that because the award bears no relationship to any profit made by Action, it constitutes unjust enrichment to the Bank. Second, Century asserts that its expenses in conducting the loan business should have been

taken into consideration when the award was made. The overhead expenses for all of Action's loan business during the accounting period—February 1, 1980 to March 31, 1983—were in excess of the income from the diverted loan business. Furthermore, if the Bank (instead of Action) had used its capital in generating the loans, it would have incurred an additional interest expense of $151,562. We do not find merit in these arguments.

The monetary award was based upon the figures provided by Century and Action in their accounting rendered to the court. The term "income," which has a well-recognized meaning in legal parlance, does not include a return of principal.[14] The accounting made to the court does not indicate that the income figure included any items other than Action's total income from the diverted loan business. There is a presumption of correctness that attaches to the trial court's decision. Thus, its decree may not be reversed in the absence of legal error affirmatively demonstrated by the complaining party.[15] Because the record before us fails to show that the $339,405 award does include principal payments on the subject loans, we cannot say that the minority shareholders were unjustly enriched by their forensic victory in the trial court. Century did not meet its burden to show error on this ground.

Assuming that the award includes gross[16] rather than net income,[17] the relief

---

ty. *Durfee v. Durfee & Canning, Inc.,* 323 Mass. 187, 80 N.E.2d 522, 527 [1948].

**14.** *Income,* as defined by Black's Law Dictionary 687 [5th ed. 1979], means "The *return in money from* one's business, labor, or *capital invested;* gains, profits, salary, wages, etc. The *gain derived from capital,* from labor or effort, or both combined, including profit or gain through sale or conversion of capital. *Income is not a gain accruing to capital* or a growth in the value of the investment, but is *a gain,* a profit, something of exchangeable value, proceeding from the property, *severed from the capital,* however invested or employed, and coming in, being derived, that is, received or drawn by the recipient for his separate use, benefit, and disposal. *Goodrich v. Edwards,* 255 U.S. 527, 41 S.Ct. 390, 65 L.Ed. 758. The true increase in amount of

wealth which comes to a person during a stated period of time. * * *" [Emphasis added.]

**15.** *Georgia-Pacific Corp. v. Lumber Products Co.,* Okl., 590 P.2d 661, 666 [1979]; *Armstrong v. Gill,* Okl., 392 P.2d 737, 738 [1964] and *McKinney v. Bland,* 188 Okl. 661, 112 P.2d 798, 800 [1941].

**16.** *Gross Income,* as defined by Black's Law Dictionary, *supra* note 14 at 687, means: "The total income of a business or individual before deductions; including salary, commissions, royalties, gains from dealings in property, interest, dividends, etc."

**17.** *Net (business) income,* as defined by Black's Law Dictionary, *supra* note 14 at 687, means: "Net profit of business arrived at by deducting operating expenses and taxes from gross profit."

granted is clearly proper. *This was not an action at law for conversion.* Rather, it was an equity suit *for restitution* to minority stockholders who sought from Century and Action "disgorgement" of their ill-gotten gains made through the diverted loan business. The object of restitution is to put the parties back into the position in which they were before the tainted transaction occurred. Restitution can be had by harnessing either doctrines that have their origin in the common law or those which spring from the equity side of our jurisprudence.[18] The unifying theme of various restitutionary tools is the prevention of unjust enrichment.[19] Equity courts have fashioned the fiction of a constructive trust in order to force restitution from one who was unjustly enriched. The Restatement of Restitution also uses the constructive trust device to explain the essence of this relief.[20] It starts with the general principle that restitution will be available whenever one has received a benefit to which another is justly entitled.[21] The inequity of retaining a benefit can spring from a variety of sources, such as fraud or other unconscionable conduct in which the recipient has received a benefit for which he has not responded with a quid pro quo. The remedy in restitution rests on the ancient principles of disgorgement. Beneath the cloak of restitution lies the dagger that compels the conscious wrongdoer to "disgorge" his gains.[22] Disgorgement is designed to deprive the wrongdoer of *all gains flowing from the wrong rather than to compensate the victim of the fraud.* In modern legal usage the term has frequently been extended to include a dimension of deterrence.[23] Disgorgement is said to occur when a "defendant is made to 'cough up' what he got, neither more nor less."[24] From centuries back equity has compelled a disloyal fiduciary to "disgorge" his profits.[25] He is held chargeable as a constructive trustee of the ill-gotten gains in his possession.[26] A constructive trustee who consciously misappropriates the property of another is often refused allowance even of his actual expenses.[27] Where a wrongdoer is shown to have been a conscious, deliberate misappropriator of another's commercial values, gross profits are recoverable through a restitutionary remedy.[28]

There is ample Oklahoma precedent for disallowing the cost of producing business wrongfully diverted from its rightful owners.[29] Moreover, we note that when as

**18.** Restatement, Restitution, Part 1, Introductory Note, pgs. 4–10 and § 4(f), p. 18 [1937].

**19.** Restitution based upon unjust enrichment cuts across many branches of the law, including contract, tort and fiduciary relationship. See 1 Palmer, The Law of Restitution § 1.1, p. 2 [1978].

**20.** Restatement, Restitution, § 160, Ch. 9, p. 640 [1937].

**21.** Restatement, Restitution, § 1 [1937] provides: "A person who has been unjustly enriched at the expense of another is required to make restitution to the other."

**22.** Douthwaite, *Attorney's Guide to Restitution,* § 8.1, p. 324 [1977].

**23.** Gadsby, 11A Business Organizations, pt. IA, § 9.02(2).

**24.** Dobbs, *Handbook on the Law of Remedies,* § 12.1, Ch. 12, p. 792 [1973]. For another definition of "disgorgement," see Tull v. United States, 481 U.S. ——, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 [1987] and Porter v. Warner Holding Co., 328 U.S. 395, 402, 66 S.Ct. 1086, 1091, 90 L.Ed. 1332 [1946].

**25.** See Douthwaite, *Profits and Their Recovery,* 15 Vill.L.Rev. 346, 355 [1970] and Scott, *The Fiduciary Principle,* 37 Calif.L.Rev. 539 [1949].

**26.** *Kirschner v. West Company,* 300 F.2d 133, 136 [3rd Cir.1962].

**27.** Restatement, Restitution, § 158, Ch. 8, p. 630 [1937] and *Sheldon v. Metro-Goldwyn Pictures Corporation,* 106 F.2d 45, 51 [2nd Cir.1939].

**28.** *A & M Records, Inc. v. Heilman,* 75 Cal. App.3d 554, 142 Cal.Rptr. 390 [1978] and Douthwaite, *Attorney's Guide to Restitution,* § 8.4, p. 344 [1977]; See also *Driscoll v. Burlington-Bristol Bridge Co.,* 8 N.J. 433, 86 A.2d 201, 233–234 [1952] where the members of a selling syndicate who participated in the illegal sale of two bridges were required to disgorge their profits from the tainted transaction and were not allowed credit for the expenses incurred in effectuating the fraudulent scheme.

**29.** Although the essence of the appellants' claim to error is their implied assertion of "good faith," they do not advance a cogent and persuasive argument that the trial court did err in not finding their diversion of business to have been done *bona fide.*

here an argument in the brief is unsupported by any citation of authority, it is insufficient to overcome the law's presumption of correctness that attaches to the trial court's decision.[30]

## II

## THE MANAGEMENT FEES PAID TO CENTURY ARE NOT "INTRINSICALLY FAIR"

The "intrinsic fairness" test is also applicable to the management fees *paid by the Bank to Century* for the services of Dean and Cochran. Although Century argues that Dean and Cochran did not receive personal gain from the fees paid to Century because their salaries were fixed, the focus here should be on Century's gain. Century received a benefit from the fees at the Bank's, and hence the minority shareholders', expense. Century, as majority stockholder, controlled the Bank's decision to employ Dean and Cochran. The situation becomes more suspect because these two men were on the Bank's Board of Directors when the decision was made. Under these circumstances, it was Century's burden to show the transaction was intrinsically fair. Century introduced evidence that these men performed needed services which benefited the Bank. The

plaintiffs' (minority shareholders') evidence was that the services performed by the two men were duplicative . and unnecessary. Faced with this conflicting evidence, we are not free to alter here the district court's conclusion that Century had failed to meet its burden to establish the fairness of the transaction. Its finding is not clearly contrary to the weight of the evidence in the record.

## III

## ATTORNEY'S FEES AND COSTS MAY BE RECOVERABLE IN A STOCKHOLDERS' DERIVATIVE SUIT

Century's argument that the plaintiffs (minority shareholders) are not entitled to their costs and attorney's fees is totally without merit. Extant case law clearly pronounces that, where a stockholder is successful in a suit instituted in behalf of the corporation and that entity is thereby enriched, the plaintiff who brought the action in a representative capacity is entitled to recover reasonable costs and expenses that include counsel fees.[31]

The trial court's decree and its restitutionary award are affirmed.

DOOLIN, C.J., HARGRAVE, V.C.J., and HODGES, LAVENDER and SIMMS, JJ., concur.

---

When a bad-faith trespasser enters upon the land of another in the willful disregard of the rights of others and produces and takes oil and gas from the premises, the measure of damage is the *full value* of the property at the time of the conversion *without* deduction for the cost of drilling and development. See e.g. *Dilworth v. Fortier*, Okl., 405 P.2d 38, 45–47 [1965]; *Barnes v. Winona Oil Co.*, 83 Okl. 253, 200 P. 985, 986–987 [1921]; *Probst v. Bearman*, 76 Okl. 71, 183 P. 886, 888 [1919]; *Texas Co. v. Pettit*, 107 Okl. 243, 220 P. 956, 959 [1923] and Annot., Right of trespasser to credit for expenditures in producing, as against his liability for value of, oil or minerals, 21 ALR2d 380, 391, § 5 [1951]. In *Pettit* the oil and gas lease was purchased pending a suit to cancel the lease. The purchaser went upon the land and commenced drilling operations over vigorous protests. Recovery of costs incident to drilling and to developing was denied on the grounds that the purchaser had notice of the adverse claims and did not purchase the lease in "good faith." In *Zelma Oil Co. v. Nemo Oil Co.*, 84 Okl. 217, 203 P. 203, 205–206 [1922], we allowed recovery of costs where the taking was inadvertent or under a

claim of right with a *bona fide* belief of title. We also recognized the rule that "where the taking is reckless, willful, or intentional, or without claim of right or title," the trespasser is not entitled to recover his costs.
See also, *Irving Iron Works v. Kerlo Steel Flooring Co.*, 103 N.J.Eq. 240, 241, 143 A. 145 [1926], a case involving unfair competition by former employees who illegally used confidential information and trade secrets filched from the plaintiff-employer in their manufacturing operations. The defendants were held accountable for "all profits" from the manufactured items with allowable deductions only for the "cost of manufacture and sale." See also Annot., Proper Measure and Elements of Damages of Trade Secret, 11 ALR4th 12, §§ 10 and 11 [1982].

**30.** *Horst v. Sirloin Stockade, Inc.*, Okl., 666 P.2d 1285, 1286 [1983]; *Smith v. Thompson*, Okl., 402 P.2d 882, 886 [1965] and *Reed v. State Election Board*, Okl., 369 P.2d 156, 158 [1962].

**31.** *Fitzgerald v. Bass*, 122 Okl. 140, 252 P. 54 [1927].

KAUGER and SUMMERS, JJ., concur in part and dissent in part;

ALMA WILSON, J., dissents.

ALMA WILSON, Justice, dissenting:

A necessary element of the corporate opportunity rule is that the opportunity in question be one of practical advantage to the complaining corporation. *Equity-Corp. v. Milton,* 43 Del.Ch. 160, 221 A.2d 494 (1966) Thus, in advancing the determination of whether any particular appropriation of a business opportunity is fair to the corporation, the interest of the corporation in the opportunity (*or the absence thereof*) is relevant.

In the case of *Gross v. Neuman,* 40 A.D.2d 772, 337 N.Y.S.2d 623 (N.Y.App. Div.1972), the Court held that a corporate president had not deprived the corporation of an opportunity where the corporation had two hospital properties that it could not operate due to a public health statute. With the approval of the board of directors, the president entered into a twenty year lease arrangement for the properties. Inasmuch as the corporation, by law, was precluded from operation of the opportunity in question, the corporation was not *deprived* of the opportunity. It is similarly my opinion that inasmuch as the bank in this case, by law, was at the relevant time precluded from operation of the independent business opportunity in question, it was not *deprived* of that opportunity by Action. The bank had *no expectancy* /business interest in the opportunity involved until after the repeal of the law prohibiting branch banking. The furnishing by one corporation to another, having common directors, of information advantageous to the latter's business and which relates to matters in which the former has no business interest or expectancy, does not constitute diversion of its assets or business opportunities for which the directors are chargeable. *Diedrick v. Helm,* 217 Minn. 483, 14 N.W.2d 913 (1944). The opportunity did not embrace an area adaptable to the bank's business which it could legally pursue at that time and into which it might easily or logically expand.

Moreover, the proof proffered to support a conclusion that the bank necessarily would have realized *any* of the loan transactions of Action, but for the operation of Action, is untenable. The evidence actually shows the bank's business dealings with Action resulted in *increased revenues for both majority and minority stockholders* of the banking corporation.

Finally, the undue restraint of business judgment, for better or for worse, on the part of corporate officers and directors is contrary to fundamental concepts of free enterprise and independent innovation for the benefit of all. The law imposes business management of a corporation on its board of directors. A business corporation being profit oriented, the decisions of the directors involve risk evaluation, assumption or avoidance, and some of these decisions may eventually prove erroneous. In the case at hand the officers and directors were advised by legal counsel before-the-fact that the operation of Action as proposed would not violate banking law. In this respect, it is said, that,

"... courts recognize that after-the-fact litigation is a most imperfect device to evaluate corporate business decisions; the circumstances surrounding such decisions are not easily reconstructed in a courtroom years later. The rule [Business Judgment Rule] recognizes that shareholders to a very real degree voluntarily undertake the risk of bad business judgment; investors need not buy stock, for investment markets offer an array of opportunities less vulnerable to mistakes in judgment by corporate officers. In the exercise of what is genuinely a free choice, the quality of a firm's management is often decisive and information is available from professional advisors. For these reasons corporate decisions by directors enjoy the presumption of sound business judgment." 18B Am.Jur.2d *Corporations* § 1705.

Courts traditionally have been reluctant to impose personal or vicarious liability for corporate business decisions upon those charged with the weight of those decisions. Doctrinally, this principle has been labeled

the *Business Judgment Rule* or "prudent man" standard. Under this rule, the directors of a corporation who are charged with decision-making responsibility are not penalized for the exercise of independent free thought and entrepreneurial and risk-taking activities, so long as performed in good faith, and with that diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances in like position. Such premise has long been the sustaining force of American ingenuity and comprises the standard embraced under Oklahoma law to this date. 18 O.S. 1981 § 1.34. *Also See, Hoye v. Meek,* 795 F.2d 893 (10th Cir.1986). Absent fraud, bad faith, gross overreaching, or abuse of discretion, the exercise of business judgment by corporate officers and directors should now, as in past cases, be respected by the courts.

I recede from this Court's abrogation of the Business Judgment Rule.